**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS ▓▓▓▓▓▓▓▓ | Case No. 22-gj-39 (BAH) |
| | Chief Judge Beryl A. Howell |
| | **UNDER SEAL** |
| | **EX PARTE TO GOVERNMENT ONLY** |

**MEMORANDUM OPINION**

In ▓▓▓▓▓▓▓ a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued a subpoena for testimony ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

the former president filed a Motion to Compel, requesting an Order requiring ▓▓▓▓▓▓ to abide by the former president's instruction to invoke executive privilege and attorney-client privilege on the latter's behalf. Having postponed ▓▓▓▓▓▓▓▓▓▓▓▓▓, thereby mooting the former president's motion, the government now moves to compel the witness's testimony because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

I.      **BACKGROUND**

The grand jury's need for testimony from ▓▓▓▓▓▓ stems directly from his knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▮▮▮▮▮  Investigation into these events has been ongoing and described at length in two prior opinions relevant to compelling the grand jury testimony of ▮▮ individuals: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮  *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-25, ECF No. 18 at 2–12 (Sept. 28, 2022) ("Sept. 2022 Mem. Op."); ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮  *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-33, ECF No. 13 at 1–14 (Nov. 19, 2022) ("Nov. 2022 Mem. Op.").  The events leading up to and including January 6, 2021, have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC").  These facts relevant to the instant witness are summarized below.

A.     **2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress**

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump.  *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf.  Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities."  *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Dec. 8,

2022)).  The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful.  *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates.  *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022) (describing the fake elector scheme).[1]  The former president's supporters took steps towards this desired end in

---

[1] 

Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all states

won by President Biden. *See id.* This effort failed in those seven states after all duly appointed

electors cast votes on December 14, 2020, for President Biden. *See id.*

      The former president and his operatives then shifted strategy, moving their focus from the

Electoral College vote to the electoral vote certification. As constitutionally required by the

Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were to be

certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided

over by the former vice president, who was to call for objections to the vote and, after all

objections were resolved by the two congressional houses and the count was complete, announce

the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional

meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of

electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent

out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that

he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump

(@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).





████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████ [8]

     "Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election.  *Thompson*, 20 F.4th at 17–18.  During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden."  *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Dec. 8, 2022) ("January 6th Rally Speech")).  The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore."  *Id.* (citing January 6th Rally Speech at 3:47:20–3:47:42, 4:41:17–4:41:33).  At that rally, the former president's attorney Rudolph Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral Count Act and called for "trial by combat."  John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10.  Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of

---

[8] ██████████████████████████████████████

████████████

the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol and to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of

official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371

(conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and

dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction

of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or

carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry,

disorderly conduct, and other offenses on Capitol grounds)).  *See United States v. Bledsoe*, No.

21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022).  Since then,

hundreds of individuals have been investigated, charged, and convicted in this District for their

criminal conduct in planning for and participating in the breach of the Capitol that resulted in

disruption of the official proceeding of Congress to certify the results of the 2020 presidential

election.

    **B.**    **Instant Grand Jury Investigation**

███████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

**C.    The Grand Jury Subpoena**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████

The government then notified the White House Counsel's Office of the subpoena on

██████████████████, and inquired whether President Biden would assert executive privilege to ██

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ That

letter also listed █████ topics to be addressed ██████████████████████████████. ██

██  The White House Counsel's Office responded █████████████, that President Biden "will

not assert executive privilege" with respect to the witness's testimony.████████████████

█████████████████████████████████████████.  President Biden

articulated that his waiver of executive privilege applied to the topics listed ████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████

The government communicated the same request to the former president's counsel by

letter ██████████████, and similarly included the ████ anticipated topics ██████████████

testimony. ███████████████████████████████████████████

███████████

During that period, ████████████ attempted to ascertain whether the former president

would assert any privilege over aspects of his scheduled testimony. ████████████████

████████████████████████████████████ emailed ████████████ counsel to the former

president, notice of the subpoena and scheduled grand jury testimony, and sought "specific

written direction" on invocation of any privileges if the former president intended to assert them.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ responded later that day that, "well in advance" ██████████████

scheduled testimony, he would provide "a letter that specifies [former] President Trump's

position on applicable privilege(s) with respect to ████████████ appearance and testimony."

████████

While awaiting instruction from the former president, ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Then, on ████████████, ████████████ followed up with ██████████ via email, having yet

to receive the promised letter, and repeated that, "[i]f President Trump is asserting any privileges

with respect to ████████████ testimony, ████████████ must commence an emergency action to

get a court ruling, before ████████████ appearance, on the assertion of any privileges by

[former] President Trump." ████████████████████████ Minutes later, ████████████ stated

his intention "to provide a clear directive from [former] President Donald J. Trump as to those

areas of questioning that would implicate executive privilege, and whether he asserts executive

privilege," and offered to call ▇▇▇▇▇▇ days later to discuss his testimony. ▇▇▇▇▇ The
following day, ▇▇▇▇▇▇▇ replied that "all communications should be in writing," and that he
did not wish to risk being held in contempt for refusing to answer questions at the former
president's instruction without a court order barring his testimony as to privileged topics. ▇▇▇▇
▇

On ▇▇▇▇▇▇▇▇▇▇▇▇ again emailed ▇▇▇▇▇▇ having not received a
response to his last message, stating that he "will not rely on ▇▇▇▇▇▇ say-so that privileges
apply here and be put in the middle of a privilege fight between DOJ and [former] President
Trump" at the risk of a contempt holding. ▇▇▇▇ He added that, "[a]bsent a court order
otherwise, I will testify on Friday," ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
responded by email that he would confer with the government on the "the procedure that would
be followed when a question is asked of ▇▇▇▇▇▇ before the grand jury, the answer to
which is covered by [former] President Trump's assertion of executive privilege." ▇▇▇▇
▇▇▇▇▇▇ same-day response reiterated that, in his opinion, "the proper course of action" is
a court order to preclude aspects of his testimony, but he added that, "if I get the prosecutor's
written assurances, I will abide by [former] President Trump's assertion." ▇▇

Later that day, specifically, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇ the former president's counsel finally sent ▇▇▇▇▇▇ a letter citing the presidential
communications privilege and instructing that he was "to the fullest extent permitted by law, . . .
not to provide testimony about, or reveal in any forum, privileged communications and
correspondence, including those that are privileged because of [his] role as an attorney." ▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The
letter on behalf of the former president expressed the view that a president's "expectation of
confidentiality in [his] conversations and correspondence with those who advise and assist him"

13

is "protected under the United States Constitution" and so makes "[a]ll such presidential communications . . . presumptively privileged." 

Finally, on September 1, 2022, ████████████████████████ the former president filed a Sealed Motion to Compel Witness ████████████ to Invoke Privilege Before the Grand Jury, as Instructed by the Privilege Holder ("Resp't's Mot. Compel"), ████████ ██ Therein, the former president requested an order directing ████████ "to properly invoke executive and attorney-client privilege to all appropriate questions when complying with the federal grand jury subpoena for testimony," ████████ based on the former president's understanding that ████████ "intend[ed] to provide privileged testimony to the grand jury against the explicit directives of the privilege holder," *i.e.*, the former president, ████████ In response, the government postponed ████████'s grand jury testimony pending resolution of a motion to compel the testimony of ████████████ over the former president's invocation of executive and attorney-client privilege, which, the parties agreed, concerned the same issues ████████████████████████████. ████████ ("This Motion seeks to prevent improper disclosure of privileged information before it occurs. As there is already a motion pending on this issue, ████████ testimony can be delayed until the Court has made its ruling."); ████████



████████████████████.[9] Accordingly, the former president's motion was denied as moot.

---

[9] ████████████████████████████████
████████████████████████████████████

Min. Order (Sept. 2, 2022).

**D.      Procedural History of Instant Motion**

███████████████, the government moved to compel ███████ to testify before

the grand jury, listing as respondents the witness and the former president. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████[10]

Simultaneous with these filings, the government requested permission for limited

disclosure of the sealed motion to the witness and the former president subject to certain

protections. ████████████████████████████████████

████████████████████████████ The government's

request for disclosure and a protective order was granted ████████████, pursuant to

Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit

the public release of proceedings on a motion connected with a grand jury subpoena or matter

before the grand jury unless ordered by the Court to "advance the important public and private

---

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

[10] ██████████████████████

interests served by the grand jury secrecy requirement."  Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 9.[11]

After conferral, the parties agreed to a briefing schedule consistent with the time requirements of Local Criminal Rule 47, giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply.  Min. Order (Nov. 16, 2022); *see also* Resp. Order of the Court, ECF No. 10 (parties' recommended briefing schedule).  Having submitted no request for oral argument on the motion, the parties rested on the arguments presented in their papers.[12]  The government's motion is now ripe for review.

## II.    DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here.  *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege or the attorney-client privilege operates to bar the compelled testimony of ████████.



Upon review, neither privilege claim succeeds because the significant need for the important evidence outweighs any interest in keeping information from the grand jury.

### A.     Executive Privilege Generally

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id.* § 3, to name a few.  Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff.  As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the Executive Branch has two distinct species, each derived from the same recognized need to protect Executive Branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege.  *See id.* at 745.  The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745).  It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved.  *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S.

683, 705 (1974).  The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both parties confirmed, at issue in this motion is the presidential communications privilege. ███████████████████████████████████████████████

███████████████████████████████████  That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege.  *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46).  This distinction is important because of what the presidential communications privilege seeks to do.  "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Nixon*, 418 U.S. at 708.  Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."  *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020).  To ensure the rigorous honesty and due diligence required of presidential

policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection. Rather, three separate categories of presidential communications exist with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see also GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)); *cf. Nixon*, 418 U.S.

at 705. Certainly, for instance, the president's lunch order is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B. Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel ██████████, and whether any level of privilege has been waived or inadequately asserted. The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all. ██████████████████████████████

██████████████████████████████████████████████

██████████████████████████████.[13]

The former president responds that the communications in question are presidential within the privilege's utmost protection because they involve "[s]afeguarding the integrity of federal elections through the faithful execution of the law," which, he claims, "is a fundamental duty of the President of the United States." ██████████████. The former president then declares that "the integrity of a federal election is a matter of national security," such that "[w]hen a President speaks with his legal advisors about the transparency, legality, and integrity of a presidential election, those conversations must be full, frank, and candid[,]" thus amounting to a privilege from disclosure that is "essentially absolute." ██████████████████████

██████████████

---

[13] ██████████████████████████

Each party is partially correct.  To begin with the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" deference under the presidential communications privilege, he is incorrect.  The communications at issue do not involve confidential military or diplomacy secrets.  Nor does the former president claim that the communications concern classified information that would risk damage to national security upon unauthorized disclosure.  Despite the former president's best argument that communications concerning the 2020 presidential election are national-security focused and thus any knowledge ███████ has of these communications is privileged, this argument is unavailing for at least two reasons.  ████████████████████

████████████████████████████████████

████████████████████████████████—were public and have no relation to secrets capable of causing damage to national security.  Second, the government's topics of inquiry do not concern matters of election security.  ████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need.  *See infra* II.C and II.D.

---

[14] ████████████████████████████████████

The government next contends that President Biden's decision not to invoke executive privilege over ███████████ testimony requires the former president's assertion of privilege to "yield." ███████████████[15] The former president highlights, however, that the Supreme Court recently and expressly held this question open, █████████████████ (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "it would thwart the primary purpose of the privilege, which is to ensure that the President can receive candid and honest advice in the performance of his constitutional duties," *id*. at 7 (citing *Nixon*, 418 U.S. at 705, and *GSA*, 443 U.S. at 448–49).

The government then proffers that the former president's privilege invocation was "too generalized and vague to qualify as an assertion" of the presidential-communications privilege. ███████████████ The former president retorts that his privilege invocation "was sufficiently clear and unambiguous such that ███████████ could abide by its terms." ████████ █████████

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witness to testify fully before the grand jury.[17]

---

[15] ███████████████████████████

[16] ███████████████████████████

[17] ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████

C. **Presidential Communications Privilege Does Not Bar Compelled Testimony**

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this

case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id*. at 753.

What resulted is the standard of need test, *id.* at 753–54, which both parties agree applies here, ███████████████████████████ The test directs that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701. The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential

communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[18]  In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

### D.    Application of the Standard of Need Test

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for ███████ testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters.  The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene.  Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress.  *See Thompson*, 20 F.4th at 15–16.  Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations.  Those that unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement along the way,

---

[18]     *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

damaged property, and delayed the certification of the 46th president have, and continue to be, prosecuted in the interest of justice and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct executed on January 6, 2021. The government disclosed to the former president topics of investigative interest. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

The topics foreshadow the grand jury's ultimate decision whether individuals are criminally culpable for participating in the inception, organization, planning, and execution of the ultimate obstruction of the presidential vote certification in violation of 18 U.S.C. §§ 1512(c)(2) and (k), 1001(a)(2), and 371. *See Thompson*, 20 F.4th at 36 (linking the former president to the events on January 6, 2021); *see also Eastman v. Thompson*, 594 F. Supp. 3d at 1198–99.

As to whether ████████████ testimony could shed important light on those matters, the answer is clearly affirmative. ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ His testimony is, thus,

directly relevant, important, and essential to the grand jury's investigation. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation,

the government correctly states ██████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ For example, what and when the former
president and his White House and campaign staff knew about election irregularities and whether
any such irregularities produced an incorrect presidential election result for President Biden, as
well as what the former president and his allies understood the law to be regarding the
congressional certification proceeding or the vice president's role in such is highly probative
context for assessing intent.  On this issue, ███████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████

████████████████████ *See* Nov. 2022 Mem. Op. at 30–33.

████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

Despite all this, Eastman stood before the large crowd of Trump supporters at the rally at the Ellipse on January 6, 2021, ███████████████████████████

██████████████████████████████████████

████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████

As another example of the value ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

     In his defense, the former president stresses that any discussion he had about the
certification of electoral votes involved his duty to ensure fair presidential elections. ████████

████████████████████████████████████████████████

will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand

jury to concur with the former president that no criminal wrongdoing occurred at all or to find

probable cause of criminal misconduct attributable to one or more individuals whose conduct is

examined.  *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of

Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important

evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the

question of whether [the investigation's target] made false statements to the White House").

Regardless of the outcome, testimony pertaining to that key information more than fulfills the

first prong of the standard of need test.

     Relevant to the test's second prong, no alternative to this evidence is available.  On this

point, the former president counters that ██████████ testimony is "duplicative of information

already presented to the grand jury," ████████████████████████████████

████████████████████████████████████████████████.

██████████████████ That argument is unpersuasive. ████████████████

███████████████████████████████████████████ he possesses unique and

inimitable evidence. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

providing the government with no available alternative to obtain this evidence short of issuing a

subpoena to Trump.

  Likewise, given the mostly conversational aspect of the communications in question,

individuals who participated in the meetings and calls or heard about them through participants,

█████████████ are the only way to shepherd in this evidence.  In its exhaustive search for

witnesses, the government states that other executive officials with knowledge of this

information are likely to assert similar executive privileges.[19]  The government thus far has not

discovered any written records of these conversations, leaving merely witnesses' recollections of

the events to serve as the "best" and only "evidence of the conversations available."  *Sirica*, 487

F.2d at 718.  Additionally, although multiple witnesses may provide testimony about the same

meeting or conversation, as the government explains, ████████████████, what these

witnesses recall may differ in detail.  Even overlapping testimony as to certain aspects of these

conversations corroborates the overall communication the grand jury seeks to consider, ensuring

that the investigation is of the utmost accuracy and completeness.

---

[19] ███████████████████████████████████████████████████████████

███████████████████████████████████████

On these grounds, ███████ possesses vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

### E.    Attorney-Client Privilege

As noted in Part I.C *supra*, following the government's disclosure of the grand jury subpoena, the former president instructed the witness "not to provide testimony about, or reveal in any forum, privileged communications and correspondence, including those that are privileged because of ████████ role as an attorney." ██████  Following discussion of the attorney-client privilege generally and the scope of this privilege when invoked for government attorneys, the Court analyzes whether the former president is entitled to assert this privilege here to block ██████ testimony in response to the grand jury inquiry and concludes that he is not.

#### 1.    *Attorney-Client Privilege Generally*

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389).  Thus, the privilege covers only communications "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[Attorney-client] privilege applies only if the person to whom the communication

35

was made is 'a member of a bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding.'" (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

The responsibility for protecting the attorney-client privilege lies with the holder: "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived.  The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case,* 877 F.2d 976, 980 (D.C. Cir. 1989)); *see also SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (placing onus on "the holder [to] zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) ("voluntary disclosure by the holder of such a privilege . . . waives the privilege").  Consequently, "settled law" directs that the party claiming the privilege bears the burden of proving that the communications are protected and must do so through "present[ation of] underlying facts demonstrating the existence of the privilege." *In re Lindsey*, 158 F.3d at 1270 (quoting *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)).  A blanket assertion of the privilege will not suffice; "the proponent must conclusively prove each element of the privilege." *Id.* (internal citation omitted).

The D.C. Circuit takes an "all-or-nothing approach" to waiver of the attorney-client privilege, *Protect Democracy Project*, 10 F.4th at 891, such that "voluntary disclosure of privileged material . . . to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter,'" *id.* (quoting *In re Sealed Case*, 121 F.3d at 741).  Consistent with this approach,

disclosure of the "substance" of privileged communications waives the attorney-client privilege. *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

As relevant here, the Circuit also recognizes a government attorney-client privilege. In that formulation, the attorney representing a government agency or department may provide legal advice that is subject to privilege. *In re Lindsey*, 158 F.3d at 1269. The prerequisites for the privilege to apply in the government attorney context, more generally, require that the communications primarily be for legal advice, and therefore "advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege." *Id.* at 1270.

Like the presidential communications privilege, the government attorney-client privilege is not always absolute. For government attorneys in the Executive Branch, this privilege is limited by their responsibility to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and the president's sworn duty to "faithfully" execute his office and, "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," *id.* art. II, § 1, cl. 8, which the Executive Branch is bound "by oath or affirmation" to uphold, *In re Lindsey*, 158 F.3d at 1273. Executive Branch attorneys must adhere "to the cause of constitutional government" and to protect the public interest through "transparen[cy] and accountab[ility]." *Id.* They owe loyalties that surpass the desires of any individual client agency and are "not to defend clients against criminal charges" or "protect wrongdoers from public exposure." *Id.* at 1272. As the D.C. Circuit eloquently explained, "[w]ith respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar," *id.*, since government attorneys have the duty to 'take Care that the Laws be faithfully executed," which encompasses the "[i]nvestigation and prosecution of federal crimes [as] one of the most important and essential

37

functions within that constitutional responsibility," *id*. (citing U.S. CONST. art. II, § 3).  As such,

"a government attorney . . . may not assert an attorney-client privilege before a federal grand jury

if communications with the client contain information pertinent to possible criminal violations."

*Id.* at 1274.

### 2.    *Attorney-Client Privilege Does Not Bar Testimony at Issue*

The binding precedent of *In re Lindsey* squarely applies to limit the former president's

assertion of attorney-client privilege over ███████████ testimony.  ███████████ is a barred

government attorney having served as ████████████████████████████████

██████████████████████ both within the presidential administration of Donald J. Trump.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

The government seeks to probe the witness about his knowledge of criminal misconduct

contributing and leading up to the attack on the U.S. Capitol on January 6, 2021, and the halt of

congressional proceedings to certify the 2020 presidential election.  In his capacity as a

government attorney, ███████████ advised the former president concerning the certification and

outcome of the election from October 2020 to his exit from the White House.[20]  Thus, he has

---

[20] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████
████████████████████████████████████████  As *In re Lindsey* instructs, such a
showing vitiates the former president's claim of privilege and permits the witness to testify to
these communications.

The former president does little to challenge this conclusion, and that minimal effort is
meritless.  After citing *In re Lindsey* in his opposition, he claims that "the Government has failed
to meet its burden of demonstrating that the attorney-client privilege does not apply."  Resp't's
Opp'n at 3.  Yet the law is clear that the burden of successfully claiming the privilege falls on the
privilege holder, not the party seeking to overcome a claim of privilege.  *See In re Lindsey*, 158
F.3d at 1270 ("It is settled law that the party claiming the privilege bears the burden of proving
that the communications are protected.").  He then spends the rest of the only paragraph
dedicated to claiming attorney-client privilege to arguing that legal advice given to the president,
especially that involving "[s]afeguarding the integrity of federal elections," "must be preserved."
Resp't's Opp'n at 3.  The well-established value of attorney-client privilege is not in dispute,
and, contrary to the former president's view, ████████████ was not his personal attorney, so that
legal doctrine is inapplicable.  Rather, *In re Lindsey* operates to permit ████████████ grand jury
testimony as an Executive Branch attorney, and the former president provides no reason to
distinguish that precedent.

To be sure, this analysis does not leave the former president without any protection from
the attorney-client privilege for his confidential communications with counsel over legal matters.
As the D.C. Circuit made clear in *In re Lindsey*, 158 F.3d at 1276, the former president's
communications with his *personal* attorneys are protected by attorney-client privilege, allowing

---

████████████████████████████████████████████████████████
████████████████████████████████████████

him full frankness and confidentiality in those conversations. Simply put, ████████ was not the former president's personal lawyer and so that protection is not implicated here.

As an Executive Branch attorney, ████████ has a responsibility and duty to inform the grand jury of information he possesses pertinent to the grand jury's investigation into ████████ ████████████████████████████████ Accordingly, the former president's claim of attorney-client privilege fails.

## III.     CONCLUSION

Based on the foregoing analysis, neither the presidential communications privilege nor the attorney-client privilege bar eliciting testimony before the grand jury from ████████ ████████████████████████████. Accordingly, the government's motion to compel testimony from this grand jury witness is GRANTED.

Date:  December 9, 2022

BERYL A. HOWELL
Chief Judge