**\* SEALED \***

```
* THIS PAGE LEFT INTENTIONALLY BLANK *


SEALED MATTER ENCLOSED


AUTHORIZED PERSONS ONLY
```

**\* SEALED \***

**\* SEALED \***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
IN THE MATTER OF:              ) Grand Jury
Grand Jury Subpoenas          ) Case No. 23-10
GJ42-17 and GJ42-69           )
                              )
INTERESTED PARTIES:           )
United States of America,     ) March 9, 2023
█████████████,                ) 10:02 a.m.
and Donald J. Trump.          ) Washington, D.C.
\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SEALED HEARING**
**(Various Portions are Redacted)**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**


**APPEARANCES:**

FOR THE UNITED STATES:
        JOHN PELLETTIERI
        JULIE EDELSTEIN
        BRETT REYNOLDS
        CECIL Van DEVENDER
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Washington, DC 20530
        (202) 598-2950


FOR ████████████:
        MICHAEL LEVY
        PAUL ENZINNA
        WHITNEY C. ELLERMAN
        ELIZABETH MARTIN
        Ellerman Enzinna Levy, PLLC
        1050 30th Street, NW
        Washington, D.C.  20007
        (202) 753-5553


FOR DONALD J. TRUMP:
        JAMES M. TRUSTY
        Ifrah Law
        1717 Pennsylvania Avenue NW
        Washington, DC 20006
        (202) 335-0634


**(Appearances Continued)**


**\* SEALED \***

**\* SEALED \***

**APPEARANCES (Continued)**:


FOR DONALD J. TRUMP:

        JOHN ROWLEY, III
        SECIL Law PLLC
        1701 Pennsylvania Avenue, NW
        Washington, D.C.  20006
        (202) 417-8652


        TIMOTHY C. PARLATORE, ESQ.
        Parlatore Law Group
        One World Trade Center, Suite 8500
        New York, NY  10007
        (212) 679-6312


ALSO PRESENT: ██████████████, Interested Party

        LINDSEY HALLIGAN

        ███████████████



Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
        Official Court Reporter


        Proceedings reported by machine shorthand.
     Transcript produced by computer-aided transcription.

**\* SEALED \***

*** SEALED ***

# P R O C E E D I N G S

1    THE COURTROOM DEPUTY:  Matter before the Court,

2  Grand Jury Case No. 23-10.  In the Matter of:  Grand Jury

3  Subpoena GJ42-17 and GJ42-69; Interested Parties:  United

4  States of America, ▓▓▓▓▓▓▓▓, and Donald J. Trump.

5    THE COURT:  Let's start with the government,

6  assuming everybody is at the table.

7    MR. PELLETTIERI:  Good morning, Your Honor.

8  John Pellettieri on behalf of the United States.

9    I am available to talk and answer any of the

10  Court's questions about any legal issues in the sealed

11  filings.

12    THE COURT:  Let's just introduce yourself for the

13  record.

14    MR. PELLETTIERI:  Yes.  John Pellettieri on behalf

15  of the United States.

16    THE COURT:  Yes.  Who else is there?

17    MR. PELLETTIERI:  We have James Pearce, Cecil van

18  Devender, and Julie Edelstein.

19    THE COURT:  All right.  Thank you.

20    Now I am going to turn to the other side.  You may

21  sit down.

22    MR. TRUSTY:  Good morning, Your Honor.

23    THE COURT:  Let me just say, I like to start every

24  proceeding by knowing exactly who is in the room,

**\* SEALED \***

**\* SEALED \***

```
1    particularly since this is a sealed hearing.  You look

2    confused.

3              MR. PELLETTIERI:  No.

4              THE COURT:  Just to be clear.

5              MR. TRUSTY:  I will try to help out on my side

6    with that.

7              THE COURT:  Excellent.

8              MR. TRUSTY:  Your Honor, Jim Trusty, on behalf of

9    President Trump as well as the office of the former

10   President.

11             I am joined at counsel table by John Rowley, who

12   is one of the similarly-situated counsel.

13             THE COURT:  Good morning.

14             MR. TRUSTY:  In the row that's associated with the

15   table, I am joined by ████████, the second seat in, who

16   the Court is familiar with.

17             THE COURT:  I know ████████.

18             MR. TRUSTY:  ████ represented by Michael Levy,

19   who is to our left, to his right.

20             THE COURT:  Michael Levy, got it.

21             MR. TRUSTY:  I'm sorry.  Remind me, Counsel.

22   Elizabeth --

23             MS. MARTIN:  Elizabeth Martin.

24             MR. TRUSTY:  -- Martin, with Mr. Levy's firm.

25             MR. ENZINNA:  I am Paul Enzinna, with Mr. Levy's
```

**\* SEALED \***

* SEALED *

1    firm.

2            THE COURT:  Paul Enzinna, okay.

3            MR. TRUSTY:  And then we have an associate from

4    ████████████████████████ who is here as well.

5            And, Your Honor, just because all of us struggled

6    getting here today, we have two other lawyers -- not out of

7    any mental struggle, but out of the traffic and the front --

8    unfortunately, using the front gate was not a great choice

9    this morning because jurors, cadets, and all sorts of other

10   people were coming in.  Two other lawyers will, hopefully,

11   be joining us, if that's all right with the Court.  I

12   understand, if the door is locked, it may or may not work

13   out.

14           Tim Parlatore and Lindsey Halligan are both set to

15   be here -- set to be here about a half an hour ago, but --

16           THE COURT:  Well, they can knock on the door, but

17   I am not sure we will hear.  Even though hearing in this

18   courtroom -- I don't know whether you have noticed -- is

19   much better than the second floor courtroom; it doesn't have

20   the air blowing through -- I don't know if they can text you

21   or something when they get to the door.  Ms. Gumiel can --

22           MR. TRUSTY:  We'll just try to keep an eye out,

23   and try to be as least disruptive as we can when they

24   arrive.

25           THE COURT:  But all of the windows are sealed; I

* SEALED *

1   don't know how you are going to keep an eye out.  You are

2   certainly welcome to keep a phone on.  I'd hate to have them

3   standing outside --

4          MR. TRUSTY:  They may be here.

5          THE COURT:  -- when they want to be inside.

6          MR. TRUSTY:  Sure, Judge.  Thank you.

7          THE COURT:  All right.  Thank you for that fairly

8   lengthy introduction.

9          Let me just say there are *ex parte* parts of this

10  briefing, in connection with this matter.  Consequently, if

11  I ask a question that -- the response to which requires

12  something that the party feels should be done an on *ex parte*

13  basis, just let me know; I will mark that.

14         If, at some point during these proceedings, I need

15  to hear from one side -- one party or the other on an

16  *ex parte* basis, I am going to invite the other parties to

17  sit in my jury room which is right around the corner; you

18  don't have to brave the masses outside.

19         I want to let you know that I am just going to ask

20  my questions.  I am going to leave it up to you to tell me

21  whether you think a response requires an *ex parte* answer to

22  be as fulsome as I need it to be on this -- what I view as a

23  fairly weighty matter.

24         So let me start, Mr. Pellettieri, with you.

25         (Whereupon, additional counsel enter the

**\* SEALED \***

1     courtroom.)

2              THE COURT:  Okay.  Are we missing anybody else?

3     Is everybody here who is supposed to be here now?

4              MR. TRUSTY:  We're all set.  Thank you.

5              THE COURT:  Okay.  For the record -- excuse me,

6     Mr. Pellettieri.

7              Can you just put on the record who else is in this

8     sealed hearing?

9              MR. TRUSTY:  Sure.  We are joined now by Tim

10    Parlatore and Lindsey Halligan.

11             THE COURT:  Okay.  Thank you.  Now the record is

12    clear.

13             All right.

14             MR. PELLETTIERI:  To the extent we go into some of

15    the facts that are *ex parte*, Ms. Edelstein will be

16    addressing that.  But I will be addressing the sealed

17    portions that are available to all of the parties which

18    largely address the legal standards and the legal issues

19    here.

20             THE COURT:  Okay.  Let me start with something

21    that has puzzled me.  And that is, I have had, since October

22    through December of 2022, a couple of sealed hearings.  I

23    have gotten, on the docket in this case, about five

24    different documents, some called "status reports," some

25    called "certifications"; but five, in total, regarding the

**\* SEALED \***

**\* SEALED \***

1    Office's compliance with the May 11, 2022, subpoena.  The

2    government doesn't mention any of those proceedings that

3    occurred before this Court.

4           Is it the government's position that the

5    proceedings that have happened over the last six or so

6    months before this Court, including the eventual production

7    of classified marked documents, I think, in October and

8    again in December, is irrelevant to evaluating whether there

9    was any sufficient evidence of criminal conduct for

10   application of the crime-fraud exception?  Is it irrelevant,

11   what happened in front of this Court?

12          MR. PELLETTIERI:  I think I will just speak

13   briefly, I mean, broadly and kind of more in the abstract,

14   rather than getting into the nitty-gritty of why it might be

15   factually relevant.  But categorically it's not irrelevant.

16   I just think that our presentation in this case is

17   sufficient to find and apply the crime fraud section -- the

18   exception.  So I don't think categorically, as a factual or

19   legal matter, it's necessarily totally -- can be totally

20   irrelevant but we're not emphasizing those proceedings.

21          THE COURT:  Well, I mean, are you not emphasizing

22   those proceedings because of the Office's later efforts to

23   comply with the subpoena with the production of additional

24   classified marked documents -- is exculpatory?

25          MR. PELLETTIERI:  No --

**\* SEALED \***

1    THE COURT:  -- and so, therefore, I shouldn't

2    consider it?

3        How can I focus on one part of the factual

4    predicate here and actually try and strike out of my mind

5    and not focus and wear blinders on what's occurred in front

6    of me?  Does that make sense, in evaluating the crime-fraud

7    exception?

8        MR. PELLETTIERI:  Well, we certainly don't see

9    anything that's happened as exculpatory, Your Honor.  We can

10   talk about that, I suppose, in an *ex parte* session to get

11   into the nitty-gritty of the facts and how they relate to

12   the *ex parte* showing we have made here if Your Honor would

13   like to do that.

14       THE COURT:  Well, let's turn to the specific

15   statutory violations that the government is citing for

16   invocation of the crime-fraud exception; and it's citing

17   18 U.S.C. Section 793, 1001, 1512 and 1519 -- 1001 -- you

18   know.  And all of those, I think, generally have to do with

19   concealing classified marked documents, national defense

20   information under 793, and relaying false information or

21   being -- engaging in obstructive conduct to the government

22   recovering, for proper storage and handling, those

23   classified marked documents.

24       And so I know the government is focusing on the

25   period before execution of the search warrant at Mar-a-Lago

1   August 8, 2022, as the key period I should focus all of my

2   attention on in evaluating whether or not there is prima

3   facie evidence that that crime-fraud exception should apply.

4   But as I have said, I, then, over a series of hearings, four

5   additional certifications in addition to the first one in

6   June of 2022, I had a number of searches done; more

7   classified marked documents produced.

8          So does that really -- doesn't that undercut, as a

9   factual matter, or undermine a view that there is some kind

10  of obstructive conduct in concealing these classified

11  records?

12         MR. PELLETTIERI:  No, Your Honor.  I think if you

13  look at -- and, again, I don't want to get too much into the

14  *ex parte* filing.  But even if you just look at all the facts

15  in the purely sealed filing, which establishes that the

16  former President possessed boxes of documents at Mar-a-Lago

17  with classification markings; he received a subpoena for all

18  documents with classification markings.  According to

19  ███████████████████████████████████████████████

20  ████████████████████████████████  ██

21  ████████████████████████████ -- to respond to

22  the subpoena, ██████████████  █████████████

23  ███████████████████████████████████████████████

24  █████████ --

25         THE COURT:  I am familiar with the facts.  I am

**\* SEALED \***

1    very familiar with these facts.

2              MR. PELLETTIERI:  Right.  I think if you just look

3    at that, and the fact that there were boxes moved out of

4    that storage room and were not in that storage room when

5    ███████████████████████████████████████████████████████

6    ███████████████████████████████████████, that is enough

7    to establish a prima facie showing of criminality, of

8    criminal conduct, or a crime or a fraud here.

9              THE COURT:  So is it the government's position

10   that -- to the extent there was some kind of obstructive

11   conduct or criminal conduct, that it went on until about

12   August 8, 2022, and then stopped?  And that's why you don't

13   want to focus on anything that happened after that?

14             MR. PELLETTIERI:  We're not making any

15   representations about when any criminality ended here,

16   Your Honor.  This is focused on -- this is certainly not the

17   only potential motion we could or maybe will in the future

18   file in this case obviously.

19             We're focused on ████████████████ grand jury

20   testimony and the testimony ██████ withheld in the grand

21   jury, and why we think we can pierce that testimony under

22   the crime-fraud exception to get the answers to the

23   questions we posed before the grand jury; that's the focus

24   of our presentation here.  It's not the most exhaustive

25   presentation that we may ever make in this case in the

1    future; but I think that's what we're focused on here.

2         THE COURT:  Well, let's go to the standard, prima

3    facie standard.

4         So the government makes a statement in its

5    briefing that:  The prima facie standard and reliance on the

6    D.C. Circuit's 1985 *In re Sealed* opinion is that there is

7    little practical difference between a probable cause

8    standard and a prima facie standard that must be met for the

9    crime-fraud exception to apply.

10        So is it the government's view that for the

11   crime-fraud exception to apply I essentially have to apply a

12   probable cause standard?

13        MR. PELLETTIERI:  We don't think that -- as we

14   read the D.C. Circuit's standards here -- it obviously has

15   the standard of a factual basis adequate to support a good

16   faith conclusion.  But, in our view, probable cause is, at a

17   minimum, sufficient to satisfy that standard.

18        There may be a delta between the D.C. Circuit

19   standard and probable cause.  But anything that meets

20   probable cause will automatically meet the D.C. Circuit

21   standard and, for that reason, we think there is ample basis

22   to find probable cause.  If the Court did find probable

23   cause, it would absolutely satisfy any potential reading of

24   the D.C. Circuit standard.  That's our view of what the case

25   law --

1    THE COURT:  Well, in assessing -- I mean, clearly,

2    you have had other courts -- Southern District of Florida

3    found probable cause for the Mar-a-Lago search warrant.  So,

4    in your view, with that finding and the withholding of

5    information by ███████████ before the grand jury, is it

6    your view that that's enough to satisfy piercing the

7    attorney-client privilege here?

8    MR. PELLETTIERI:  Well, it's obviously two

9    components of the prima facie crime-fraud exception.  But if

10   you --

11   THE COURT:  Right.  Putting aside the nexus.

12   MR. PELLETTIERI:  Exactly.  We think that would

13   have been sufficient.  We obviously didn't rest on that.

14   But the --

15   THE COURT:  And that's why I come back to my first

16   question to you.  What the magistrate judge in Florida

17   didn't have is what I have in front of me, which is six

18   months of searches being conducted, uncovering some

19   additional classified-marked documents.  And so to the

20   extent that that information is exculpatory, shouldn't I be

21   considering that too?

22   MR. PELLETTIERI:  I guess there are two points.

23   THE COURT:  And I don't know everything the

24   government knows, and perhaps you need to tell me.  Is it

25   not all exculpatory?

* SEALED *

1          MR. PELLETTIERI:  Well, we don't view it as

2     exculpatory at all, Your Honor.  But I certainly -- Your

3     Honor, it would be appropriate to take into account any

4     information before the Court in the larger context to

5     determine whether there has been a finding of a prima facie

6     crime or fraud.

7          That said, potentially exculpatory explanations --

8     while certainly within the Court's purview, I think that:

9     In order to defeat a probable cause determination or --

10    whether you call it a prima facie or probable cause

11    determination has to be strong enough, basically, largely

12    undisputed to truly defeat the substantial showing we have

13    made here.

14          So, for example, just in general -- the general

15    law of probable, cause, it's just kind of black letter law

16    that probable cause does not require ruling out innocent

17    explanations for suspicious facts.  I mean, that's just

18    recently in the --

19          THE COURT:  I have to say, it is interesting to me

20    that the government takes the position that it can

21    establish -- that probable cause is the standard to apply

22    here.

23          I think the Circuit has -- 12 years after the *In*

24    *re Sealed* case from 1985, it criticized that dicta and

25    backed away from that dicta.  And the Circuit essentially

* SEALED *

—— * SEALED * ——

1   said:  You don't really have to -- you certainly don't have

2   to show beyond a reasonable doubt for finding applicability

3   of the crime-fraud exception.  You don't have to pretend you

4   are a grand jury and find probable cause to believe a crime

5   was committed; the Circuit said that also.

6          So the Circuit has basically said whatever that

7   prima -- reasonable -- good reason to believe that there is

8   a prima facie case established with some facts, it's less

9   than probable cause.

10          MR. PELLETTIERI:  We agree, Your Honor.

11          THE COURT:  But are you asking the Court only to

12   apply the probable cause standard here?

13          MR. PELLETTIERI:  No.  We're not asking you to

14   apply it.

15          We're saying that if the probable cause

16   standard -- the probable cause standard is above and beyond

17   what we need to establish for the prima facie fraud or

18   crime.

19          THE COURT:  I think that the government is trying

20   to point to the probable cause standard because you have a

21   probable cause finding by a magistrate judge so you think

22   you are done.  I don't think you are done at all because I

23   have got lots of other -- six months, seven months of other

24   activity in front of me that could cut, to my view, both

25   ways; but no one has addressed it.  It's not just the

* SEALED *

1    government that has ignored what's happened over the last

2    seven months; no other party in this case -- not former

3    President Trump's counsel, not ███████████ counsel, and,

4    I guess, ███████ hasn't even appeared anywhere.  No one has

5    addressed what has happened over the last seven months and

6    the four additional reports or certifications after the

7    June 2022 certification in evaluating the prima facie case

8    here and facts here in assessing whether any of the

9    different criminal statutes cited by the government are

10   sufficient.

11          MR. PELLETTIERI:  Your Honor, I know I said

12   Ms. Edelstein would address some largely *ex parte*, but I

13   think it might be appropriate now for her to discuss some of

14   these post-August 8 issues that Your Honor is addressing.

15   So if you wouldn't mind her perhaps speaking to this right

16   now, she can address that.

17          THE COURT:  Okay.

18          MS. EDELSTEIN:  Thank you, Your Honor.

19          I will note that ███████████████ attorneys weren't

20   privy to our motion to compel proceedings with respect to

21   the other locations.  So I can address that now, but I don't

22   know if you have any concerns about who is present in the

23   courtroom for me to address that.

24          THE COURT:  No.  I mean, I think the government --

25   I know there are lots of things that happened that I have --

**\* SEALED \***

1    I don't need to know about, so I really -- that's why I

2    invited the parties at the outset.  You tell me whether some

3    parties should or shouldn't be privy, and I will respect

4    that.  You tell me.

5            MS. EDELSTEIN:  So I think my view on this is

6    that -- what I am going to say was established in that

7    litigation with only the former President's attorneys, so I

8    think it would be appropriate for them to be in the

9    courtroom for what I can say they know from those

10   proceedings.  But I think it probably doesn't make sense for

11   ███████████ attorneys to be in the courtroom for that.

12   But I do want to explain why I think that, actually, those

13   proceedings support our position and are not evidence of

14   anything exculpatory.

15           THE COURT:  Okay.  So this is what we're going to

16   do.  This is going to be a little bit of musical chairs;

17   everybody is going to have to be patient with that.

18           Ms. Edelstein, I do want to hear this question.

19   But let me finish on the legal matters where everybody can

20   hear before I start playing a little bit of musical chairs.

21   I do assure you, the jury room here is actually quite

22   comfortable; it has a window even.

23           Let me finish talking to Mr. Pellettieri first,

24   and then I will excuse ███████████████ counsel, and

25   hear from you on the other matter.

**\* SEALED \***

**\* SEALED \***

1    MS. EDELSTEIN:  Thank you, Your Honor.

2    THE COURT:  We may be going back and forth a

3    little bit with other chairs.

4    Okay.  So we're going to come back to

5    Ms. Edelstein on the post-August 8 matters.

6    I take it that -- I think you can answer this

7    here.  You are not planning on asking ███████████ anything

8    about what happened after August 8, 2022; is that correct?

9    MR. PELLETTIERI:  Currently, no.  We didn't ask

10   that ██████ initial appearance, and this motion to compel

11   does not seek that testimony.

12   THE COURT:  All right.  Well, one of the things

13   that -- one of the topics that the government wants to cover

14   with ████████████████████████████████████████████████████

15   ██████████████████████ with the former President.  And it was

16   at that time, as I have tracked the timeline here, ████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████.

20   I take it that the government isn't wanting to

21   inquire of ████████████ about any ██████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████; is that right?

24   MR. PELLETTIERI:  I think this would probably be

25   more appropriate *ex parte*, Your Honor.

**\* SEALED \***

**\* SEALED \***

 1          THE COURT:  Okay.  Because I have seen nothing

 2    about any potential obstruction with the June 24th subpoena.

 3    It was issued June 24.  You got the hard drive with video

 4    evidence, I think, in early July.  I haven't heard about any

 5    obstructive conduct or questionable conduct in terms of

 6    failure to comply fully with that subpoena.  And so if

 7    ███████████████████████████████████████████████████████

 8    ██████████████████████████████, I think there would have

 9    been a draft form -- in earlier communications about the

10    subpoena being forthcoming before June 24.

11          But if that was the nature of ████████████████

12    conversations with ███████████████████, all about the

13    ███████████████████████████████    ████████████████████

14    ████████████████████████████████████████████

15    ███████████  about if any crime-fraud exception were found

16    here?

17          MR. PELLETTIERI:  I think I will say in this open

18    session that our view is that those communications further

19    facilitated a crime and fraud that we've -- prima facie

20    crime and fraud that we have identified in our papers.  And

21    we can get into some of the factual predicates for that in

22    the *ex parte*; but we believe that those communications are

23    part and parcel of the 793(e), the 1001(a)(1), (a)(2).

24          THE COURT:  All right.  So if I ascertain from

25    ████████████  that -- in ███████  *ex parte* conversation with

**\* SEALED \***

1    me -- ████████████████████████████████████

2    ████████████████████████████████████████

3    ██████████████████████, you would say the government still

4    believes that would be --

5            MR. PELLETTIERI:  Yes.

6            THE COURT:  -- there would be a sufficient

7    nexus -- let me finish my question -- there would be a

8    sufficient nexus to the crime-fraud exception here that the

9    government would want to inquire of ████████ about ██

10   ████████████████████████?

11           Do I understand you correctly?

12           MR. PELLETTIERI:  That's correct, Your Honor.

13           THE COURT:  All right.  So I will have to hear

14   about that *ex parte*.

15           Let's talk about the criminal violations alleged

16   since, for any application of the crime-fraud exception, all

17   the elements of each of the crimes triggering crime-fraud

18   exception have to be met with some prima facie foundation.

19           And the government has cited in its motion to

20   compel 18 U.S.C. Section 793, 1001, 1512, and 1519.

21           1519 is pretty clear.

22           1001 is pretty clear.

23           Two of the statutes, 793 and 1512, have a number

24   of different subsections.  And the government's motion to

25   compel, at page 16, is pointing to the particular criminal

1   statutes that it's invoking; it doesn't tell me which

2   subsection of 793 or 1512 it's pointing to.

3         So don't you have to be more precise than

4   identifying which statutory provision you are relying on?

5         MR. PELLETTIERI:  Well, we're happy to be a little

6   bit more precise here, Your Honor.  793(e) we believe would

7   be the correct predicate to look at.

8         THE COURT:  Well, that was certainly the portion

9   of 793 that was cited in the Mar-a-Lago search warrant.  But

10  I just wanted to be clear that that was what you are also

11  relying on in the motion to compel.

12        MR. PELLETTIERI:  Correct.

13        THE COURT:  And as to 793(e), that provides for a

14  violation when:  The violator has unauthorized possession of

15  the national defense information materials, and then

16  willfully retains the same.

17        One reading of that -- and I haven't actually

18  dealt with this statute before.  But one reading of that is

19  a person has to, at the outset, have unauthorized possession

20  of the documents.

21        Is the government claiming that the former

22  President had unauthorized access at the outset to any

23  national defense information, and that's why you are relying

24  on 793(e)?

25        And, if so, you are going to have to point me

* SEALED *

1   either now or in your *ex parte* to where in your papers it

2   says that the former President of the United States had

3   unauthorized possession of this information at the outset.

4        MR. PELLETTIERI:  I think it might be more

5   appropriate to talk about that *ex parte*, Your Honor.

6        THE COURT:  Okay.  Well, I just need clarification

7   of what I understand only implicitly because it's not really

8   explained.  And you don't, in your motion nor in your

9   *ex parte*, go through element by element, which is the

10  analysis that's required for invocation and application of

11  the crime-fraud exception.  But you are going to have to

12  clarify the basis for why 793(e) applies.

13       I mean, Section 793(d) applies to a violator who

14  has lawful possession, access, or control relating to

15  national defense information, and then willfully retains the

16  same and fails to deliver it on demand to a U.S. officer,

17  employee entitled to receive it; but you don't invoke

18  793(d).

19       Why are you relying on (e) and not (d)?

20       MR. PELLETTIERI:  We think that's the most apt

21  here.  And we're happy to walk through with Your Honor

22  element by element the various offenses.  I mean, rather

23  than thread the needle between at what might be appropriate

24  *ex parte* and not appropriate *ex parte*, we think it's best to

25  probably do that all *ex parte*.  But we're happy to do that

* SEALED *

1   with each of the offenses and every element for each

2   offense.

3        THE COURT:  Do you think that this is an excessive

4   request on my part?

5        I expected to see that in your briefing because

6   the law is pretty clear; I have to go element by element.

7        The prima facie standard is:  You have to have a

8   factual basis for a reasonable person to believe that

9   element is met under whatever standard applies.  And you

10   didn't do that.

11        Did I miss that in your briefing?

12        MR. PELLETTIERI:  Well, we think that the

13   presentation establishes the elements of the offenses

14   considered in their totality which is similar to, again, a

15   probable cause determination.  When you look to the totality

16   of the evidence in the prima facie showing, it does

17   establish the elements.

18        I will say there is some out-of-circuit case law

19   saying that, for a prima facie case, you don't have to do it

20   element by element.  But we accept that.  We do meet that

21   standard here, and we're happy to walk you through that.

22        THE COURT:  All right.  And also -- okay.  And,

23   also, which subsection of 1512 are you relying on?

24        MR. PELLETTIERI:  1512(b) and (c)(1), Your Honor.

25        THE COURT:  (b) and (c)(1)?

──── * SEALED * ────

1    MR. PELLETTIERI:  Yes.

2         THE COURT:  All right.  Well, that's helpful to

3    have, that clarification.

4         Okay.  Let me turn to ████████.

5         The government indicates that ██████ counsel has

6    informed the government that ████████████████████████

7    ████████████████.

8         Have you gotten a privilege log for that?

9         MR. PELLETTIERI:  We have not, Your Honor.

10        THE COURT:  Okay.  And since you haven't gotten a

11   privilege log for ████████████████, do you believe any

12   privilege is waived for failure to provide a privilege log?

13        MR. PELLETTIERI:  We have not taken that position,

14   Your Honor.

15        In order to expedite and facilitate these

16   proceedings, we communicated with counsel for ████████; we

17   identified the topic areas.  We were informed that there was

18   ████████████████████████ withhold.  And in order to

19   streamline this, rather than ████████ in the grand jury or

20   require what we thought were unnecessary proceedings and

21   hoops to jump through, we accepted that and then included

22   that in our motion.  We think that that is -- we're not

23   asserting that there is a waiver because of that -- because

24   of something that we accepted moving forward.

25        THE COURT:  I see.  If I find the crime-fraud

**— * SEALED * —**

1    exception applies here, do you think you are just going to

2    be entitled to get ███████████████?

3            MR. PELLETTIERI:  We think it's appropriate to

4    order ██████████ and all the documents listed in

5    ██████████████ privilege log for *in camera* review under the

6    *Zolin* standard, which is less than the prima facie crime

7    fraud standard.

8            We think the correct procedure here would be to

9    enter the proposed order that we included with our reply,

10   which orders the production of all of the documents in

11   ██████████████ earlier January privilege log plus the ████

12   █████████ withheld by ██████████ for *in camera* review under

13   the *Zolin* standard.

14           And the Court can take those documents into

15   account together with our *ex parte* submission, which we

16   think is adequate in itself but you are entitled to take it

17   into account in connection with it, and then enter an order

18   permitting the questioning of testimony on the topics we

19   identified, plus turning over any -- first, ██████████████

20   ████████████, insofar as it furthers or facilitates the crime

21   fraud that we established, and then any documents by

22   ██████████████ that further facilitate the crime fraud that we

23   established, excising opinion attorney work product.

24           THE COURT:  But you don't know as you stand here

25   today whether the withheld ██████████ from ██████████████ is

**\* SEALED \***

1    attorney-client privilege or fact work product or opinion

2    work product?

3            MR. PELLETTIERI:  No.  And we don't think it

4    matters with respect to ████████████████ has not

5    independently asserted the work-product privilege, so that's

6    an irrelevant consideration with respect ████.  It's just

7    a pure crime-fraud exception application ████.

8            THE COURT:  All right.  What else do you want to

9    tell me?

10           MR. PELLETTIERI:  I think we can leave the rest

11   for an *ex parte* presentation, Your Honor.  But we are happy

12   to answer any additional questions.

13           THE COURT:  All right.  I am going to invite

14   ████████████ and your crew to just follow Ms. Gumiel to my

15   jury room.

16           MR. TRUSTY:  Your Honor, for the record, may I

17   just lodge an exception to the exclusion -- I would just

18   object.  And I will speak more about *ex parte* submissions

19   and strategy here, but there is no reason why ████████████

20   ████ counsel should be excluded from comments regarding

21   privilege.  I mean, ████ a party to this -- a party in

22   interest.  ████ a representative of President Trump and the

23   Office as well.

24           I haven't heard anything other than:  We don't

25   want ████████████████ wasn't here before.  But it would

**\* SEALED \***

**\* SEALED \***

1   be more robust for this Court if we can at least see some

2   glimmers of what is being presented by the government in

3   this respect.

4           THE COURT:  Well, you are going to be here.

5           MR. TRUSTY:  Sure.  But ▇▇▇▇▇▇▇ has separate

6   interests, and ▇▇▇▇▇▇▇ representative; so to exclude

7   their ability to even hear something that directly applies

8   to the arguments at hand seems unwarranted at this point.

9           THE COURT:  And yet, at the same time, with

10  knowledge of otherwise confidential information comes

11  enormous responsibility.  ▇▇▇▇▇▇ may not know want to

12  know ▇▇▇▇ doesn't need to know and what the government

13  believes ▇▇doesn't need to know because everything you know

14  you have a responsibility to keep your mouth shut about

15  outside of the court.  So ▇▇▇▇ not want to hear what the

16  government feels ▇▇▇▇▇ heard before and ▇▇▇▇ not want

17  to know.

18          MR. TRUSTY:  Well, I'd like ▇▇▇▇ have the choice

19  rather than the government make it ▇▇▇▇▇.

20          MS. EDELSTEIN:  Can I clarify that?

21          In discussing the motion to compel proceedings --

22  because ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23  ▇▇▇▇▇▇▇▇▇, I am not objecting to ▇▇▇▇▇▇ being

24  present if ▇▇▇▇▇ to be present in ▇▇capacity as one of

25  the former President's attorneys.  It's ▇▇▇▇▇▇

**\* SEALED \***

* SEALED *

```
1    attorneys who were not privy to those proceedings.

2              MR. LEVY:  Your Honor, if I may be heard.

3              THE COURT:  Mr. Levy.

4              MR. LEVY:  On behalf of Silverman, Thompson,

5    Slutkin & White -- and ████████████ .

6              The attorney-client privilege that the government

7    is seeking to pierce is a privilege that belongs to the

8    client, and not to the lawyer.  So we have no objection.

9              We have actually no stake in the fight over the

10   actual application of the crime-fraud exception to the

11   attorney-client privilege, so we have no objection to

12   leaving for that reason.

13             THE COURT:  Right.  So please follow Ms. Gumiel.

14             ████████████ , do you want to stay or do you want

15   to accompany your lawyers?

16             (Whereupon, ████████████  confers with counsel.)

17             MR. LEVY:  ██████going to come with me.

18             THE COURT:  Thank you.

19             For the record, ████████████  has decided to

20   accompany ██████counsel to sit comfortably in my jury room.

21             (Whereupon, Mr. Levy, ████████████ , and an

22   associate exit the courtroom.)

23             (Whereupon, an ex parte proceeding was held.)

24             THE COURT:  Yes.

25             MR. TRUSTY:  I probably should have asked that
```

* SEALED *

1    first.

2              THE COURT:  That's okay.  I thought of it.

3              MR. TRUSTY:  Thank you.

4              THE COURT:  Sometimes I add value.

5              MR. TRUSTY:  I don't think there is any issue

6    there.  Your Honor, I hope that I can add some value today

7    too.

8              THE COURT:  Well, I think -- you know, I think,

9    before I turn to you, I wanted to hear the government.

10             Just so you see this from where I am sitting --

11   because it's a little bit confused -- I think █████████

12   is going to want to hear everything that you say.  So before

13   I turn to you, I wanted to finish with the government and

14   hear their *ex parte* explanations.  It's not your turn yet;

15   although, I do want to hear from you.

16             When I do hear from you, I think I am going to

17   have ██████████   come back.

18             MR. TRUSTY:  That makes sense.

19             Where do you want us to go during the *ex parte*?

20             THE COURT:  I think you are welcome to stay, so

21   you can be seated right where you are, unless you would

22   prefer to leave.

23             MR. TRUSTY:  No.  To finally hear some of the

24   government's evidence, by way of an *ex parte*, would be a

25   welcome moment.  Obviously, we are not *ex parte* at that

**\* SEALED \***

1    juncture.

2         THE COURT:  Okay.  Just be seated, Mr. Trusty.

3    You are welcome to stay.

4         MS. EDELSTEIN:  To be clear, the only thing that I

5    can address with them present is the motion to compel

6    proceedings.

7         The other things that Mr. Pellettieri referenced

8    that will have to be held *ex parte*, we strongly object to

9    them being here for.

10         THE COURT:  Okay.  So I do like to keep this as

11    adversarial as possible where possible.

12         So, Ms. Edelstein, please share the information

13    that you feel that you can share comfortably with former

14    President Trump's counsel present.  And then, when you have

15    to turn to other matters, I will excuse you all, too; and

16    then I will hear the rest of that.  And then, when we finish

17    that, you-all will come back; and I will hear your

18    presentation.

19         For the record, so the record is absolutely clear

20    at this moment, ███████████████ counsel have left the

21    sealed proceedings.  Mr. Trusty and former President Trump's

22    counsel remain here.

23         (Present are:  Government counsel, James Trusty,

24    John Rowley, Timothy Parlatore, and Lindsey Halligan.)

25         THE COURT:  Okay.  Now, the record is clear.

**\* SEALED \***

1        Ms. Edelstein.

2        MS. EDELSTEIN:  So the one thing that I can

3   address with them present is that Your Honor had some

4   questions about how the motion to compel proceedings, with

5   respect to the government's concerns that there was not a

6   full recovery of the classified material after August 8 --

7   which there was not; and they were privy to those

8   proceedings.  There were a couple of things that I can say

9   in front of them about those proceedings.

10        I would find there to be nothing exculpatory about

11   them.  As Your Honor may recall, the government moved at

12   some point to hold them in contempt over those proceedings;

13   and I would reference Your Honor to a few things.

14        First of all, one of the things that has been

15   discussed in these proceedings is that ███████████ has

16   represented to the government that ████understanding on

17   June 3rd was that all of the responsive documents to the

18   government's May 11 subpoena were located in the storage

19   room; and what happened after August 8th simply confirms

20   that ██████████████ belief was mistaken.

21        And in the motion to compel proceedings, as Your

22   Honor is well aware, the government was informed that

23   counsel for the former President located classified

24   documents in two additional locations; one of them was a

25   storage unit and the other one was actually Mar-a-Lago.  But

1    they have admitted that that classified information was not

2    actually present at Mar-a-Lago when the government searched

3    on August 8, further supporting the government's theory that

4    there is intentional misconduct in this case.

5            Your Honor will also recall that, when we

6    expressed concerns about there not having been full

7    compliance with the May 11th subpoena to the former

8    President's counsel, they did not eagerly conduct these

9    searches.  Instead, they fought our motion to compel in

10   court.  They only searched Mar-a-Lago after you,

11   essentially, ordered them to do so.

12           So there is -- in my mind, this only reinforces

13   that the former President was eager to hang on to additional

14   classified materials at a time where he had no authority to

15   retain them.

16           THE COURT:  So why didn't the government review

17   all of those proceedings in its pending motion because the

18   absence of it was -- to put it mildly -- surprising.

19   Unless -- and that's why I wanted to have this hearing.

20           I know some of the parties asked for the hearing.

21   But, believe me, I wanted to have this hearing to find out:

22   Did you view everything that happened as exculpatory, and

23   that's why you just left it out? -- so I would have a

24   blinkered view of what I should be looking at for invocation

25   of the crime-fraud exception?

**\* SEALED \***

1    MS. EDELSTEIN:  Not at all, Your Honor.

2         The reason that it was not a big focus of these

3    proceedings is that our understanding is that ▇▇▇▇▇ was

4    not at all involved at that point, and that ▇▇▇▇▇▇▇▇

5    involvement at the -- with the additional searches that

6    occurred after August 8 was minimal, if any.  So we focused

7    our motion on the time period where we felt that we could

8    best establish a nexus between ▇▇▇▇▇▇ involvement

9    and the crime fraud that occurred.

10        THE COURT:  So -- okay.  Well, that's interesting.

11        So could it be that ▇▇▇▇▇, having been

12   hired to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇,

13   which culminated in the execution of a search warrant on

14   August 8, 2022, was then sidelined, and then other lawyers

15   were brought in to ensure full compliance?  And so is this

16   just a matter of a lawyer perhaps doing an inadequate job,

17   or some kind of purposeful misleading?

18        MS. EDELSTEIN:  I can address in a fully *ex parte*

19   setting why we strongly believe that it was not ▇▇▇▇▇

20   not doing an adequate job on June 3rd that led to the

21   presence of classified information still being at Mar-a-Lago

22   after ▇▇ search.

23        THE COURT:  Okay.  So there were two issues we

24   were going to address *ex parte* -- *ex parte* from

25   ▇▇▇▇▇.  One issue was, the huge vacuum of any party

**\* SEALED \***

─────── * SEALED * ───────

1    in this -- related to this particular motion addressing

2    anything that happened after August 2022.

3            I am going to have the same question for you,

4    Mr. Trusty.

5            But the second was on your ███████████████

6    ████████████.  And is that something you can address with

7    the former President's counsel here? -- or do you have to do

8    that in a complete *ex parte* proceeding?

9            MS. EDELSTEIN:  No, Your Honor.  It has to be

10   addressed in a complete *ex parte* proceeding.

11           THE COURT:  Okay.  All right.  And going through

12   the elements, is that something you want to do in a fully

13   *ex parte* proceeding?

14           MS. EDELSTEIN:  Yes, Your Honor.

15           THE COURT:  All right.  So, Counsel, this is what

16   we're going to do -- because I don't want them, the lawyers,

17   to be sitting in my jury room while I am going through all

18   of the elements.  It's going to be tedious for me because it

19   wasn't briefed, and it's going to be a long wait for them.

20           What I plan to do is:  I am going to excuse you

21   now so that I can hear what they must tell me only in

22   completely *ex parte* proceedings about the facts.

23           I am then going to bring everybody back, and I am

24   going to turn to you and ████████████ for my questions.  And

25   then, before we get to the elements, I am going to excuse

* SEALED *

─── * SEALED * ───

1   you completely so that you won't be sitting in my jury room

2   waiting for that.  I am presuming that this part is going to

3   be shorter than going through all of the elements.

4           So, with that plan, I will ask Ms. Gumiel to take

5   you back to my jury room.

6           MR. TRUSTY:  Your Honor, can I just raise one very

7   small procedural point?

8           THE COURT:  Yes, of course.  As I am making up the

9   procedure as we go, if anybody has comments let me know

10  now -- or better ideas.

11          MR. TRUSTY:  If you tell me to come or go, I am

12  coming or going.  I haven't figured out what the pattern is;

13  but you tell me, and I will leave.

14          The real quick preview is, in terms of our

15  division of labor on our side of argument, the intention I

16  had was to address some of the new things I have been

17  hearing, the crime-fraud exception, prima facie, in

18  furtherance of --

19          THE COURT:  I want to hear all of that from you.

20          MR. TRUSTY:  And then, in terms of anything really

21  relating to ███████████████████ -- the work-product

22  privilege, opinion fact, all of the issues that were kind of

23  borne out through some supplemental orders by the Court

24  recently -- that would all be Mr. Levy.  If the Court is

25  okay with that division of labor -- obviously, I think that

* SEALED *

* SEALED *

1    makes sense.

2              THE COURT:  Absolutely.

3              MR. TRUSTY:  Great.

4              THE COURT:  Just follow Ms. Gumiel.

5              (Whereupon, all Trump counsel exit the courtroom.)

6              MS. EDELSTEIN:  Your Honor, I assure you that we

7    came here prepared today to discuss element by element.  I

8    hope that it will not take as long as you think because I

9    have it all spelled out in front of me.

10             THE COURT:  Okay.  Perfect.  It would have been

11   nice to have it in writing.  Perhaps maybe you should just

12   put it in writing for me.  If you have it already written --

13   it already looks, from the document you were holding up --

14   it's all written, typed.  Perhaps it would just be easier

15   and save us all time if go you put a caption on that and

16   submit it.

17             MS. EDELSTEIN:  As is your preference, Your Honor.

18             THE COURT:  That would be my preference.

19             MS. EDELSTEIN:  Yes, Your Honor.

20             One point of clarification that I will make here

21   with respect to 793(e).  With respect to unauthorized

22   possession, courts have defined it as consisting of three

23   possibilities; one of them is that an individual possesses

24   documents in an unauthorized location and that, in large

25   part, is our theory of unauthorized possession.  And there

* SEALED *

* SEALED *

1    are, in our search warrants, citations to information

2    supporting that Mar-a-Lago was not an authorized location

3    for the storage of classified information.

4          THE COURT:  Well, I actually am much more familiar

5    with the crime fraud statute.  And there there is a clear

6    demarcation between people who have authorized access and

7    then exceed their authorized access, and people who have

8    unauthorized access from the beginning because they're

9    hackers.

10          I sort of viewed 793 as written with the

11    authorized access and then you exceed it or you unwillfully

12    retain it versus (d), which is:  You start off with

13    authorized access.  And so I haven't done a legislative

14    history search.

15          As I have said, I never have had an opportunity to

16    interpret 793(e).  But just looking at that statute and the

17    CFAA statute, in terms of how they're written, I would say

18    that there have been a lot of courts that have interpreted

19    the CFAA the way I have been looking at 793.

20          So why aren't you using 793(d)?

21          MS. EDELSTEIN:  Because the actus reus in 793 is

22    the retention.  So we look at unauthorized possession or,

23    conversely, lawful possession under (d) as what the person's

24    possession was at the time it was retained.

25          So when we charge individuals who retain

* SEALED *

* SEALED *

1  classified information in their homes, we always charge them

2  under (e) rather than (d) because at that time the

3  individual was in unauthorized possession.

4        THE COURT:  Has the D.C. Circuit ever interpreted

5  793?

6        MS. EDELSTEIN:  So I can't think of a D.C. Circuit

7  case.  There are D.C. District Court cases such as

8  *United States versus Kim*, before Judge Kotelly, in which the

9  elements of the statute have been analyzed.

10       I am relying on a case in the Fourth Circuit,

11 *United States versus Ford*, when I speak of unauthorized

12 possession including the retention of classified

13 information; actually, the statute uses the term "national

14 defense information" in an unauthorized location, falling

15 under unauthorized possession.

16       THE COURT:  I think that is a really forced

17 reading of the statute, to be quite honest.

18       I mean, 793(d) is:  Whoever, lawfully having

19 possession of, access to, control over, or being entrusted

20 with any document; and then:  Willfully retains the same and

21 fails to deliver it on demand.

22       To me, that strikes me as:  You lawfully possessed

23 it at the outset; you had lawful authorization to access it.

24 But then, when it was demanded to be returned, you didn't;

25 and you willfully retained it.

* SEALED *

**\* SEALED \***

1      To me, that -- but, you know, I may not have the

2    opportunity to interpret that here and spare you that

3    because I think, through all of your warrants and other

4    investigative efforts that you have made, you have used

5    793(e).  But, I mean, it's not how some analogous statutes

6    have been interpreted, and I think it's a little bit of a

7    strained reading.  But I am not interpreting it here.

8      But let's go back to what you can tell me in a

9    totally *ex parte* basis of why everything that happened in

10   front of me was not correctly interpreted to be exculpatory

11   but, in fact, bolsters a prima facie finding of crime fraud

12   being applied and why the ███████████ conversation has

13   sufficient nexus to whatever obstructive conduct may have

14   been going on with the classified marked documents,

15   warrants, application of the crime-fraud exception to the

16   ███████████.

17      Because I view a conversation by ███████████ with

18   the former President about compliance with the ██████

19   ████████ for videotapes to be not necessarily a clear nexus

20   to compliance with the May 11th subpoena -- not only are

21   they separate subpoenas, they're after separate objects.  So

22   you can explain both.

23      MS. EDELSTEIN:  Which issue would you like me to

24   start with, Your Honor?

25      THE COURT:  Why don't you start with the

**\* SEALED \***

* SEALED *

```
1    post-August 2022 events.

2              MS. EDELSTEIN:  Sure, Your Honor.

3              Notably, when  █████████  testified before the

4    grand jury, ████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████    The government has no reason to doubt that.

7              It's the government's strong belief looking at the

8    evidence, including the fact that between May 24th and

9    June 2nd there were 64 boxes removed from the storage room;

10   showing the exodus concludes on June 1st.

11             And then, on June 2nd, there are only 25 to

12   30 boxes that are present -- that are returned to the

13   storage room prior and are, therefore, present during

14   ███████████████    search.  That lends strongly to the belief

15   that those classified documents -- or documents with

16   classification markings as the subpoena called for -- were

17   not located in the storage room on  ███████████  when

18   ████████████  conducted  ███████  review; and extremely

19   intentionally so that ██████████████████████████████████

20   ██████████████████████████████████████████████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████████████

23   ███████████████.

24             The subsequent proceedings have only reinforced

25   the government's theory that there were, in fact, documents
```

* SEALED *

**\* SEALED \***

1   with classification markings that were located outside the

2   storage room where ████████████ was led to believe all

3   responsive documents were located.

4        I don't see anything exculpatory about how those

5   proceedings went on.  They clearly did not want to do

6   additional searches.  They were only done after ordered to

7   do so by this Court.  And quite frankly, Your Honor, the

8   government is not completely certain that all of the

9   documents with classification markings have still been

10  produced to the government.

11       THE COURT:  All right.  What about the ████████

12       MS. EDELSTEIN:  Yes, Your Honor.

13       In the grand jury, ████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████.  And

16  what we think was obstructed after that, or part of this

17  scheme to conceal and further retention of national defense

18  information, is not that they didn't produce the CCTV

19  footage -- and that subpoena was issued to the Trump

20  organization, and we don't have any reason to believe they

21  didn't comply.

22       But what we want to establish from ████████████ is

23  ████████ did, in fact, ████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████

**\* SEALED \***

1    ███████████████████████████████████████████.

2         So, right after we think the former President

3    learned about the subpoena for CCTV footage, there is a

4    series of events -- a very suspicious series of events, one

5    that I would call misconduct that occurs immediately

6    afterwards. ████████████████████████████████████████████

7    █████████████████████████████████████████████████

8    ████████████████████████████████  ████████████████████

9    ██████████████████████████████████████

10        If Your Honor refers to the exhibits that are

11   sealed, filed, and beginning at Exhibit 18, we see the

12   manifest that, on the day before, ████████████████████

13   ████████████████████████████████  ████████████████

14   █████████████████████████████████████████████████

15   ████████████████████████████████  ██████████████████████

16   █████████████████████████████████████████████████████

17   ███████████████████████████████████████████

18   █████████████████████████  █████████████████████████

19   ████████████████████████████████████████

20   ████████████

21        He then has a communication with ██████████████████

22   ████████████████████████████████████████████████

23   ████████, in which he tells ████████████ that he has to █████

24   ████████████████████████████████████████.  That

25   is also in the binder, in the exhibits that follow

———— * SEALED * ————

1    Exhibit 18.

2         THE COURT: ███████████████████████████

3    ████████████████████

4         MS. EDELSTEIN: ████████████████████████

5         THE COURT: ███████████████

6         MS. EDELSTEIN: █████████  ████████████

7         THE COURT:  Okay.  ███████████████████████████

8    ██████

9         MS. EDELSTEIN: ████████  ████████████████

10   █████████████████████████████   ████████████████

11   ████████████████████████████████████████████

12   █████████   ███████████████████████████████████████

13   ████████████████████████████████████████████

14        So while he is saying that to certain individuals,

15   he reaches out to ██████████████████ I think ████ last name

16   is; and ██████████████████████████████████

17   ████████████████████████████. And ███████████████████

18   █████████████████████████████████████████

19   █████████████.

20        ███████████████████████████████████████

21   ███████████████████████████████████████

22   █████████████ ██████████████████████████████ █

23   ████████████████

24        What happens during this trip is also evidence of

25   misconduct.  One of the first places that ██████████████████

* SEALED *



We have the footage from the relevant time period.
And at least on those cameras -- and we have requested
additional footage -- we never see the boxes or the
documents being returned to the storage room.  So it's a
reasonable inference that they were taking steps to figure
out how to get the classified information back into the
storage room without being detected on the cameras after

* SEALED *

**\* SEALED \***

1    they had learned that we had subpoenaed the videotape

2    footage.

3           THE COURT:  So that's your theory.  Because I have

4    seen mentioned in both warrants and in your motion to

5    compel -- I can't remember whether it's *ex parte*, the other

6    part of it -- about this incident that I think occurred on

7    June 25, right? -- of the less than a minute footage of

8    ███████████████████████████████████████████, and

9    then leaving.  I think they left.  Or did they go into the

10   storage room --

11          MS. EDELSTEIN:  Very briefly.

12          Again, we can't see them actually enter.  But,

13   from what we see on the footage, it looks like they very

14   briefly entered the storage room.

15          THE COURT:  I had no idea why are you telling me

16   that? -- what am I supposed to make of that?

17          This is the first time, from where I sit, that I

18   am understanding what your theory of that conduct is.

19   ██████████████████████████████████

20   ████████████████████████████████████████

21   ██████████████████████████  ██████████████

22   █████████████████

23          MS. EDELSTEIN:  ████████████████  █

24   ██████████████████████████████████████

25   ████████████████  ████████████████████

**\* SEALED \***

**\* SEALED \***

1  ███████████████████████████████████████

2  ████████████████████████████████████

3      THE COURT:  ██████  ████████████████████

4  ███████████████████████████

5      MS. EDELSTEIN:  ████████████  ██████████████

6      THE COURT:  ██████  ████████████████████

7  ████████████████████████████████████████

8  ███████████████████████████████████████

9  █████████████████████████████████████████

10     MS. EDELSTEIN:  ██████████████

11         ████████████████████████████

12 ████████████████████████████  ████████

13 ████████████████████████████████████████

14 ██████████████████████████████████

15 ████████████████  ██████████████

16 ████████████████████████████████

17 ████████████████████████████████████

18 ████

19     THE COURT:  ██████  ████████████████████

20 ██████████████████

21     MS. EDELSTEIN:  ██████████████

22     THE COURT:  ██████  ████████████████████

23     MS. EDELSTEIN:  ████

24     THE COURT:  ████████████████████████████

25 ██████████████████████████████████████████

**\* SEALED \***

* SEALED *

1
2
3            All right.  Anything else before we bring the

4      other parties back?

5            MS. EDELSTEIN:  I don't think so, Your Honor,

6      unless Your Honor has any additional questions.

7            THE COURT:  No.  But I am going to ask you if you

8      can turn around your analysis of the evidence and how it

9      relates to each of the elements in the criminal statutes

10     you're invoking for application of the crime-fraud

11     exception.  I think you can turn that around by tomorrow

12     morning, since you already have it written and typed up?

13           MS. EDELSTEIN:  They are only bullet points, Your

14     Honor, but --

15           THE COURT:  I think you can turn that around by

16     tomorrow.

17           MS. EDELSTEIN:  I look to my colleagues because I

18     am tied up with witnesses, basically, between now and then.

19     As long as my colleagues tell me they can do it, then I will

20     rely on their expertise.

21           THE COURT:  All right.  Okay.  So I am now going

22     to -- unless there is anything else that has to be done on

23     an *ex parte* basis, I am going to ask the other parties to

24     come back in.

25           Anything else?

* SEALED *

**— * SEALED *—**

1      MS. EDELSTEIN:  That's all, Your Honor.  Thanks so

2  much.

3      THE COURT:  And we're also going to take a

4  five-minute break.

5      (Whereupon, a recess was taken.  The *ex parte*

6  portion continues.)

7      THE COURT:  One last question I had also that,

8  probably, is more appropriate to be inquired about during

9  this *ex parte* session.  That is: ████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████

16        ████████████████████████████████████████████████

17 ██████████████████████████████  ████████████████

18 ██████████████████████████████████████████████

19 ████████████████████████████████

20        ██████████████████████████████████████

21 ██████████████████████████████████  ██████████

22 ████████████████████████████████████████████████████

23 ██████████████████████████████████

24      MS. EDELSTEIN:  ██████████████████████████████

25 ██████████████████████  ████████████████████████████

**\* SEALED \***

* SEALED *

1   ███████████████████████████████████████

2   ███████████████████████████████████████

3   ████

4         THE COURT:  ██████████  ████████████

5   █████████████████

6         MS. EDELSTEIN:  ████████

7         THE COURT:  █████████████████████

8   ███

9         MS. EDELSTEIN:  ████████████

10  ████████████████████████  ██

11  █████████████████████████████

12  ██████████████████████████████

13  ████  ██████████████████████████

14  ████████████████  █████████████

15  ███████████████████████████████████

16  ███████████████████████████████████

17  ██████████

18       ██████████████████████████

19  █████████████████████████████

20  █████████████████████████████

21  ███████████████████████████

22  ████████████████████████████

23  ███████████████████████  ██

24  ███████████████████████████████████

25  █████████████████████████

* SEALED *

**─ * SEALED * ─**



```
 1  ████████████████████████████████████
 2  ████████████████████████████████
 3      THE COURT: ████████████████████████
 4  █████████████████████████████████████████
 5  ██████████████████████████████████████
 6  █████████████████████████  ████████████████
 7  ████████
 8          █████████████████████████████████
 9  ████████████████████████████████████
10  ██████████████████████████████████████
11  ███████████████████████████████████████
12  ████████████████████████████████████
13  █████████████████████████████████████
14  ██████████████████████████████████████████
15      MS. EDELSTEIN: ████████████████████
16  ████████████████████████████████████
17  █████████████████████████████████████████
18  ██████████████████████████████████
19  ███████████████████████
20      THE COURT: ████████████████████████
21  ████████  ████████████████████████████████
22  █████████████████████████████████████
23  ██████████████████████████████████
24          ███████████████████████████
25  ██████████████████████
```

**\* SEALED \***

1    MS. EDELSTEIN: ████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ███████████████████████████████   ████

5    ███████████████████████████████

6    THE COURT:  But it could clearly appear to be

7    exculpatory that they then went off and did all of these

8    searches and found more and produced more classified marked

9    documents.

10    MS. EDELSTEIN:  Your Honor, there are over --

11    THE COURT:  It is not a frivolous or a trivial

12    thing to break the attorney-client privilege; I view that as

13    an incredibly serious step to take.  I want all of the

14    evidence I can get before I do that.

15    MS. EDELSTEIN:  Your Honor --

16    THE COURT:  What I have in front of me is six to

17    seven months of what appears, from where I sit, to be

18    multiple searches, multiple certifications, and -- you know,

19    that undermine a finding of obstructive intent or willful

20    concealing.

21    MS. EDELSTEIN:  A few things on that, Your Honor.

22    First of all, my colleagues cited to you case law

23    that just because there is a merely innocent explanation

24    doesn't undermine a prima facie showing.

25    But what we are focusing our motion on isn't the

**— * SEALED *—**

1    evidence that was found in the storage unit or even in this

2    box that they didn't fully comply with the subpoena.

3              Our motion is focused on the fact that, on

4    August 8, there were over 100 documents at Mar-a-Lago that

5    were found that bore classification markings.  And the

6    timeline here -- and I am happy to go through it with you

7    again -- but the timeline between the issuance of the

8    subpoena and the conduct on June 3rd speaks not of an

9    innocent explanation; it speaks of somebody who was trying

10   to retain classified information.  And we have

11   ██████████████    testimony in the grand jury that  ████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████   ███████████████████████████████████████████

15   ████████████████████████████████████████████

16             THE COURT:  I have read that.

17             MS. EDELSTEIN:  ████████████████████████████

18             THE COURT:  I have read that.

19             MS. EDELSTEIN:  And while after court order --

20   when they were ordered to conduct further searches and you

21   granted the motion to show cause, that, at that point, they

22   took steps to hire outside parties to conduct searches.  And

23   we can't even be sure that they searched all of the areas

24   that had documents with classification markings.  That

25   simply has no bearing on the intentional misconduct and the

**\* SEALED \***

**\* SEALED \***

1    evidence that we have shown in the time period for which we

2    are seeking ████████████ testimony; that there was

3    something extremely intentional about the conduct.

4           While we're talking about a small set of

5    classified materials that were later produced after ordered

6    by this Court to take additional steps to make sure that

7    there weren't still classified materials in their possession

8    following August 8, nothing of that sort happened.

9           And I would also point Your Honor to the testimony

10   that ██████████ gave saying that ████████████████

11   ████████████████████████████████████

12   ████████████████████████████████

13   ████████████████████████████████████

14   ████████████████████████████████████

15   ████████████

16          ████████████████████ -- they more than

17   establish a prima facie case and specifically link the

18   attorney conduct, ████████████ conduct, ██████████████

19   ████████████████████████████████████

20   ████████████████████████████████

21   ████████. And ████████, another attorney, who knew

22   nothing -- ██████ literally said in the grand jury: ████████

23   ████████████████████████  ████████████

24   ████████████████████████████.

25          And that additional searches were conducted after

**\* SEALED \***

**\* SEALED \***

1    Your Honor ordered them to do so months later I see, under

2    no circumstances, that that could potentially be exculpatory

3    conduct even if that were something that Your Honor needed

4    to consider, which you don't based on the case law that

5    Mr. Pellettieri cited to you.

6         THE COURT:  One of the cases that you-all cite --

7    and perhaps this is the *Feldberg* case, Judge Easterbrook's

8    case.  And in that case he does what I think is a very, very

9    clear job of describing the logistics for which there is no

10   crime fraud, for which there is no privilege and, then,

11   communications where there might be.

12        Are there matters that ██████████ testified to

13   or withheld testifying to in the grand jury that you think

14   flunks the Easterbrook test in *Feldberg*?

15        MS. EDELSTEIN:  So, arguably, we do think that --

16        THE COURT:  Because it seems ████████████████

17   ████████████████████████.  I want to be clear as to

18   what ██████ withhold that you think relates to the mechanics

19   and the logistics?

20        MS. EDELSTEIN:  So, Your Honor, ██████ testify to

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████  ████████████████████

25   ██████████

**\* SEALED \***

**\* SEALED \***

1    Arguably, under *Feldberg*, a lot of this

2    information that we're seeking isn't even privileged.  But

3    ██████████████████████████████████████████████████████

4    ████████████████████████.

5    THE COURT:  Okay.  So I am going to pursue that

6    ████████████.

7    All right.  Let's bring them in.

8    MS. EDELSTEIN:  Thank you, Your Honor.

9    (Whereupon, the proceeding pauses.)

10   MS. EDELSTEIN:  Sorry, Your Honor.  Can I jump in

11   with -- I assure you, this will only take a few seconds.

12   My colleagues said that they want to accommodate

13   Your Honor; but if it's possible for the *ex parte* filing

14   regarding the elements to have to you tomorrow afternoon

15   that would be much appreciated.

16   THE COURT:  That's fine.  Why don't we say

17   4 o'clock.

18   MS. EDELSTEIN:  Thank you.

19   (Whereupon, all counsel returned to the

20   courtroom.)

21   THE COURT:  All right.  I can begin with you

22   Mr. Trusty, and then I will turn to Mr. Levy.  Or would

23   you -- one prefer a different order?

24   It doesn't matter to me.

25   MR. TRUSTY:  I am happy to go.

**\* SEALED \***

1      Your Honor, we are at a juncture -- at an

2   important juncture in this investigation.  And I would

3   respectfully submit that this effort to fully pierce all

4   communications from the ███████████ is, essentially, a

5   bridge too far.

6      I will give the Court some reasons that talk about

7   the crime-fraud exception, and the frailty of relying on

8   unchallenged information.  I understand that is part and

9   parcel of grand jury supervision; that the Court is not

10  going to line up a jury of discovery experts and have a

11  trial over every issue that can be raised by the parties.

12  But this is --

13     THE COURT:  Let me just assure you, you know,

14  judges prefer adversarial proceedings; it makes sure we

15  don't make a mistake.  It helps us.

16     It is not -- this is not a comfortable position

17  that any judge in this country likes; and it's only done

18  under circumstances of necessity for grand jury secrecy in

19  an ongoing investigation.  But you don't have to tell me all

20  of the problems with it.  I am acutely aware of the

21  problems.  In some ways, that just means you have me, in

22  some ways, being ultraskeptical in querying the

23  government -- not that that gives you much confidence

24  because you don't know what is going on.

25     But you don't have to talk about the discomfort

1    that you-all have with *ex parte* proceedings because it is

2    not the preferred approach in our system, and it is not --

3    it's one that I think requires extraordinary caution,

4    particularly in a context of overcoming something like the

5    attorney-client privilege, which is sacrosanct.  So you

6    don't have to tell me the policy reasons, I get it.  I am

7    acutely aware of it.

8            MR. TRUSTY:  I understand.

9            Your Honor, I don't intend to belabor the

10   institutional issues that you are identifying.  I am here to

11   maybe sow additional jaded thoughts, in terms of the

12   reliability of this process specific to this investigation;

13   in other words, not just kind of waxing eloquent about the

14   systemic problems that come with this.

15            I will start with that, which is not where I was

16   going to start.  I really have, kind of, two focal points;

17   one is the applicability of the crime-fraud exception, and

18   the general frailty of this particular *ex parte*-type

19   proceeding.

20            But also what has been overlooked so far, at least

21   in terms of the government's perspective, which is the idea

22   of in furtherance; that the communications -- part of the

23   prima facie presentation or proof that the Court would have

24   to be satisfied includes not just the general:  We think

25   Donald Trump committed a crime, and here is why; but a

1    causal link, a nexus to the actual comments.

2            And I will get to some of the case law on that in

3    a minute, I don't want the Court to lose track that that is

4    coming.  I think it's a hugely important omission in the

5    government's theory here.

6            But I heard some things before we were excused

7    that I think were just astounding; and they really bring

8    home the fact that, in this particular case, there is an

9    extraordinary zeal that is accompanying this prosecution

10   that is inviting the Court to go down a road that ultimately

11   we believe would be a reckless road to go down.

12           I will be specific.

13           We heard from the government just now -- just

14   before the *ex parte* proceedings -- that when the Court asked

15   questions about the efforts of defense -- of counsel for the

16   President to comply with the subpoena, we heard, even just

17   in those five minutes of comments, misstatements --

18   significant misstatements or mischaracterizations of the

19   actual facts.

20           I will give you some examples.

21           Number one, Ms. Edelstein made comments about the

22   motion to compel.  Remember, Your Honor, we had to file a

23   motion to compel; we all remember it.  We all remember it

24   was not granted also.

25           She said to this Court -- reminded this Court:

**\* SEALED \***

1   You had to order them to search Mar-a-Lago.  That's not what

2   happened.  I mean, the Court leaned heavily.  I mean, the

3   Court, basically, said I am not -- my words --

4           THE COURT:  I think what she said was that I

5   granted the motion for an order to show cause.  I did grant

6   the motion for an order to show cause.  And then, as part of

7   that process -- in that hearing where I had to start off by

8   clarifying was this a contempt hearing, where we needed to

9   invite all of the press that was sitting out in the

10  hallway? -- or was this consideration of whether there

11  should be a contempt hearing?

12          And it was a consideration of whether there should

13  be a contempt hearing because of all of the assurances from

14  counsel that the former President and the 45 Office were

15  serious about trying to comply with the subpoena --

16          MR. TRUSTY:  We were.

17          THE COURT:  -- and were proceeding apace to do

18  that --

19          MR. TRUSTY:  Understood, Your Honor.

20          THE COURT:  -- as reflected by the surprise

21  declaration we got that day.

22          MR. TRUSTY:  I could quibble about timing and why

23  things are deemed surprises when they are actually factually

24  connected to events that had just happened.

25          But my point is the characterization -- I will,

**\* SEALED \***

1    kind of, stand by the record ultimately that the record, in

2    terms of today --

3            THE COURT:  It is clear that I issued no contempt

4    finding --

5            MR. TRUSTY:  And no order to direct us to do the

6    search.

7            THE COURT:  -- and no order to hold in contempt.

8            MR. TRUSTY:  You indicated:  I know your client

9    won't like it -- my words, but a good summary I think.  I

10   know your client won't like it, I really think you should

11   consider it; and that was the end of the proceeding.

12           We went and we did the exact thing the Court urged

13   us to do, which was to do a thorough search of Mar-a-Lago

14   including places where there was no reasonable likelihood of

15   finding documents.  We said:  We're here; we need to do it.

16           One of the things that just came up -- and this

17   is, again, why I suggest to the Court that the reliability

18   of this *ex parte* process is particularly suspect.  We had

19   counsel for the government announce that all of those

20   efforts to comply with the subpoena -- perhaps under the

21   shadow of Court contempt but, again, legitimate efforts;

22   complete efforts.  ███████████████████████████████

23   ███████████████████.  We did everything they could ever

24   ask, including --

25           THE COURT:  ███████████████.

1    MR. TRUSTY: ██████████████████████

2    ███████████████  ██████████████████████████

3    ████████████  ████████████████████████

4    ███████████████████████████████████████

5    ██████████.  But, Your Honor, we took it seriously.

6         To hear government counsel saying we were ordered

7    to do it when we weren't, that's a small flavoring thing.  I

8    am not saying that's the big issue.

9         But we also heard government counsel tell the

10   Court that it's not -- first counsel -- that we didn't

11   really emphasize the compliance efforts, and then added:  We

12   don't see anything exculpatory about it.

13        Now, the second counsel that stood up said:  It's

14   not exculpatory, it's inculpatory -- which is astounding.

15   That tells me that this is the tunnel vision that's

16   infecting the process.  We are unable to challenge --

17        THE COURT:  But, Mr. Trusty, can I just say, it

18   was a puzzle to me that the government didn't talk about it,

19   but you didn't either.

20        MR. TRUSTY:  We don't know the facts they're

21   alleging.  How are we supposed to knock down factual

22   presentations from the government when we're not privy to

23   any of them, respectfully.  I don't mean to raise my voice.

24        So that's our problem with briefing this.  We're

25   sitting here saying:  How do we file a compelling brief for

* SEALED *

1    the Court?  We can talk about the law.  We can talk about

2    the nexus.  We can talk about how temporal proximity is not

3    enough.  We can talk about, maybe hypothetically, how

4    ███████████  couldn't possibly be part of obstruction.

5            We don't even know the dates or the specifics of

6    the crimes that they're relying on for this.  I think there

7    is some slay to hand when it comes to trying to rely on

8    Judge Reinhart signing off on a search warrant to say that

9    that is enough for crime-fraud exception because,

10   presumably, that -- we haven't been privy eight months later

11   to the warrant -- the affidavit.  But presumably --

12           THE COURT:  You haven't been privy to a redacted

13   one?

14           MR. TRUSTY:  It is as redacted as the Gulf after

15   the Exxon spill -- maybe a little hyperbole -- but in the

16   ballpark.  I mean, some of the most important things that

17   we're even talking about now, ████████████, there are big

18   portions that are redacted that are within our knowledge,

19   like it couldn't possibly harm an investigation.  That's one

20   of the reasons for the relief we ask for, instead of --

21   certainly, before any ruling in favor of the government's

22   piercing, is for us to have access to the search warrant

23   unredacted and to the *ex parte* materials.  So I make my

24   record on that.

25           But here is the development that I heard that,

* SEALED *

* SEALED *

1    again, just, to me, drives home the unreliability of these

2    submissions.  When you asked Ms. Edelstein questions about

3    compliance, she described a box showing up in the office of

4    President Trump with classified documents.

5            THE COURT:  That's the December box --

6            MR. TRUSTY:  I'm sorry?

7            THE COURT:  I call it the December box.  It was

8    revealed to me, the Court -- revealed to me in a December

9    certification.

10            MR. TRUSTY:  Sure.  And the suggestion -- not even

11    the "suggestion" -- the explicit comment made to this Court

12    said this was inculpatory; this was a moment of ongoing

13    obstruction.  Nothing can be further from the truth.  But,

14    also, the government knows it's far from the truth.

15            I will be specific.

16            There was a young woman that worked for President

17    Trump, I think about 24-years-old.  She worked in the

18    correspondence area of the office of the presidency down on

19    North Flagler Street, if you remember that particular street

20    name from eventual searches.  When she worked out at North

21    Flagler, another person, another employee said:  I want you

22    to take this box and hold on to it.  It's essentially daily

23    summaries of the President's activities.  The box is a

24    banker's-size box, probably about 4,000 pages of material.

25            She has that box at North Flagler Street, under

* SEALED *

* SEALED *

1    her desk or nearby, for some period of time before she moves

2    over to Mar-a-Lago because the President has now come down

3    from Bedminster, I think, in September, if I remember my

4    time frame.  So the box comes with her.  The box is sitting

5    under her desk.  At some point she's advised:  Hey, make

6    copies of everything in that box because the speechwriters

7    might want that to try to link up:  Where was the President

8    on Day X or Day Y?

9          She undertakes this ridiculously laborious task of

10   scanning one by one, essentially, about, I guess -- rough

11   guess, 4,000 pages of material.  It is a mind-numbing

12   exercise for anyone to do this kind of scanning of 4,000

13   pages.  She goes through that.  She sees nothing

14   extraordinary; daily summary, daily summary, daily summary.

15         As it turns out, there are seven pages within

16   there that have some form of marking on them.  Not cover

17   sheets where it would grab your attention, but some internal

18   marking.  One of which even said:  If there is no

19   attachment, this isn't classified anymore.  So even by its

20   own terms it might have been declassified.  No evidence that

21   she knew that she was accessing anything criminal or

22   worrisome.

23         She takes the box on her own accord and decides:

24   I am just going to put it back in the little gift closet

25   room that is connected to the President's office, also known

* SEALED *

1   as the bridal suite.  So the box appears there, and it is

2   after August 8.  It's never been searched at Flagler; it's

3   never been searched at the office of the President.

4        We get down there, and the search agents

5   start going through -- we see this box in the middle of the

6   floor surrounded by all sorts of paraphernalia in the room,

7   and we go through it.

8        The agent goes through it.  She goes:  Wait a

9   minute; what about this?  She says, You know what?  This is

10   so mind-numbing, do it a second time.  Go through it a

11   second time.  She does that, no additional documents.  That

12   stuff is immediately turned over.  I mean, the email went

13   out to Jay Bratt.  It was turned over, I think, the same

14   day, if not the next morning.  Then we found out that she

15   had made a copy of these things by the process of scanning.

16   And so we made arrangements for her to, basically, turn over

17   her laptop within a couple days, which she did.

18        There is nothing from that story that suggests any

19   sort of crime-fraud exception -- criminality for her,

20   criminality for the President -- and we're being told that

21   this is evidence of ongoing obstruction.  I mean, that's

22   literally how it was brought out here this afternoon.

23        It's nothing personal.  But the government knows

24   the facts I have just told you.  This young woman is now

25   represented; the attorneys have had contact.  They have

**─ * SEALED * ─**

1   talked about the substance I just provided to the Court,

2   that's why I'm so comfortable doing it.  And to know that,

3   at least in their collective knowledge -- I don't know if

4   she participated in the interview directly or not; I thought

5   she might have, but I don't know.

6        But it's certainly within their collective

7   knowledge that it's a completely unfair thing to stand up

8   here before this Court and try to take that little vignette,

9   that little factual scenario, and turn it into something

10  that's not just not exculpatory but is inculpatory, and to

11  present that type of information without real challenge; I

12  mean, that's when we stumble into the ability to challenge

13  it.

14        THE COURT:  Well, it is my understanding, from the

15  ████████████  that are on the table to inquire of ████████████

16  ████████████████████████████████████████████████████.

17  So all of the incidents with the box and everything that

18  happened after August 8, 2022, is really not covered in

19  these topics and not information that, from my

20  understanding, the government will pursue of ████████████  in

21  terms of ████testimony in front of the grand jury.  It's

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████

25        So, you know, there is this demarcation of what

**\* SEALED \***

1   they are going to inquire about.  I don't think that they're

2   saying that there is something suspicious about that box

3   they need to inquire about.  And they're not invoking the

4   crime-fraud exception to hear about any otherwise privileged

5   conversations that occurred in conducting those other

6   searches that resulted in the four additional certifications

7   in October through December.  ██████████████████████

8   ██████████████████████████████████████████████████.

9           So my question was:  How does what happened in

10   that October through December period affect my evaluation of

11   what occurred before?

12           MR. TRUSTY:  Understood.  And I would submit it is

13   exculpatory, or at least the instinct they seem to be

14   displaying in asking the question I think was correct, which

15   is:  This is, kind of, undeniably noncriminal

16   exculpatory-type behavior.

17           My point still stands, which is:  You are being

18   asked to accept, really, carte blanche information presented

19   by one side only to make an important historic

20   determination.

21           Again, remember -- I won't get political.  I will

22   just say the overall context here is a sitting President

23   authorizing criminal investigative tools against a

24   competitor.  We have to be blind to not recognize that's

25   weighty stuff.  Your Honor, I think, referred to this as a

* SEALED *

1    weighty proceeding; it is.  They're asking you to take a

2    leap.

3              They have even said, on page 13 of their brief,

4    that:  The crime-fraud exception is something that is

5    regularly ordered.  I thought:  I don't know.

6              I was in Maryland as an AUSA for ten years; maybe

7    we're sleeping way out there in Greenbelt.  I didn't see a

8    crime-fraud exception pass through there in ten years.

9              I know there is case law.  Obviously, it's a

10   concept; it is one that can apply.  I am going to talk about

11   the case law in a second.

12             But to act like this is some sort of a regular

13   ask, and then to know that -- even from the limited exposure

14   we have to their facts, that there are serious credibility

15   issues that infect this process, that should cause more than

16   institutional discomfort for the Court in terms of grappling

17   with this type of issue.

18             In our brief we raise three small points.  But to

19   make this larger point, one is -- when they characterized

20   President Trump's turning over 15 boxes in January of 2022,

21   the way they phrased it is:  The former President sought to

22   delay the Department's access to the 15 boxes -- brackets,

23   15 boxes -- and prevent access by claiming executive

24   privilege.

25             Even that -- there is a flavoring of obstruction

* SEALED *

1   to that kind of phrasing.  Maybe I am being a little too

2   precise.  But NARA sets their statutory deadlines for

3   ability to review and assert privilege.  NARA believes

4   somehow that they have the discretion to shorten it; we

5   don't really see it in the statute, but whatever.

6          So they say the statute says 30; they tell us:

7   You have 15.  We say, no, we should have 30.  That's

8   described as:  Seeking to delay the Department's access.

9   Well, it's also seeking to enforce the law and give us

10  enough time to actually reasonably assert or not assert

11  executive privilege.  And preventing access by claiming

12  privilege -- well, okay, sure, that's the definition of

13  privilege in a sense.  Any time a privilege is asserted, a

14  valid privilege, it is thwarting one side's ability to know

15  some sort of truth; I get that.  But that's just a small

16  example from their pleading that I thought was interesting

17  advocacy in terms of phrasing things and framing things in

18  the most negative pejorative light they could.

19         The second one was more stark, which is the

20  June 3rd conversation.  I mean, that's a centerpiece of

21  reliance, in a sense, for their motion; to say:  This is

22  what happened on June 3rd.  This is what ████████ said.

23         They have two inconsistent representations -- or

24  at least incomplete -- of what ████████ said to them.

25  And we will say to this Court -- we'll proffer to this Court

1   as officers that ████████████ didn't say either of those as

2   quoted.  So there is a real -- I mean, to be generous to

3   everyone, I think there is a little bit of an elephant and

4   the blind men parable of what exactly was the

5   conversation --

6           THE COURT:  I'm sorry.  What is the dispute over

7   what ██████████ said or didn't say?

8           MR. TRUSTY:  Well, this goes to whether ██

9   ████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████

11  ██████████████  ████████████████████████████████

12  ████████████████████████████████████████████

13  ██████████████  ██████████████████████████████████

14  ████████████  ████████████████████████  That's not how the

15  conversation went.

16          So, again, I don't know the full representations

17  they made in their *ex parte*.  But we know -- from the face

18  value of their pleading, we dispute a factual quote that

19  they're attributing to ████████████████ on June 3rd.  It's a

20  very important juncture, and we disagree.  We included

21  something of --

22          THE COURT:  And your view is that -- what did

23  ████████████████ say?  If there is a dispute, what is your

24  position about what ████ said?

25          MR. TRUSTY:  Neither of the things that they have

**\* SEALED \***

1    attributed █████ -- I am not in a position to start

2    providing factual testimony without having any idea what the

3    other side has, what we're not privy to.

4            I don't think it would be fair to █████████ or

5    our client to start engaging in, kind of, our own one-sided

6    communications in a tit for tat when we are not able to see

7    the full picture.

8            We also provided the snippet of Mr. Parlatore's

9    testimony. ████████████████████████████████

10   ███████████████████████████████

11   ███████████████████████████████

12   █████████████████   █████████████████████

13   ████████████████   ██████████████████████

14   ████████████████████████████████████████

15   █████████████████████████████████████

16   ██████████████████████   ████████████████

17   ████████████████████████████████

18   █████████████████   █████████████████████

19   █████████████████████████████████████████

20   ████████████████

21           THE COURT:  And you are talking about what -- what

22   document are you referring to?

23           MR. TRUSTY:  I am talking about the government's

24   filing in this case.  Well, I'm sorry, the transcript of

25   Mr. Parlatore's grand jury which was the only transcript we

**\* SEALED \***

**\* SEALED \***

1   received, which was actually filed as part of, I think, a

2   previous motion; I can't remember if that was the motion to

3   show cause.

4          But that is -- I am happy to supplement the record

5   with a formal filing to make this part of the record if the

6   Court wants.  But we received that transcript as part of

7   their pleading.  ███████████████████████████████████

8   ████████████████████████████████████████

9          THE COURT:  Just remind me.  Was the grand jury

10   transcript from Mr. Parlatore submitted as part of the

11   record in this matter?

12          No.  Okay.  That's why it's a little bit of a

13   surprise to me.

14          MR. TRUSTY:  Okay.  I am happy, again, to -- I

15   know we received it from the government as an attachment to

16   one of their motions.  There have been so many motions I

17   can't remember exactly what the context was.  But I am happy

18   to dig that up.  And we can certainly file, under seal, a

19   supplement for the Court to see it.  I would be happy for

20   the Court to see it.

21          THE COURT:  Okay.  You can do that today.

22          MR. TRUSTY:  Thank you.  We will.

23          But, Your Honor, the point of that is -- these are

24   the people trying to tell you it's a regular thing to pierce

25   the privilege.  And, frankly, their piercing -- from what I

**\* SEALED \***

**\* SEALED \***

1    have seen, their piercing is, basically, trying to take an

2    ax to all of the communications rather than a scalpel.  I

3    mean, the case law does not support a blanket communications

4    are wide open, even if you say:  I'm only asking

5    about ███████ .

6              THE COURT:  Let me ask you a question, Mr. Trusty.

7              Would you agree that questions about logistical or

8    mechanical matters of complying with a court order including

9    for production of records, whether it's a subpoena or --

10   complying with a subpoena, that that is not privileged

11   information, even if it's a lawyer who conducts the search;

12   that who the lawyer -- what steps the lawyer took to figure

13   out where responsive records are; who the lawyers spoke to

14   in order to figure out where responsive documents are;

15   scope, volume, and other logistical matters; where the

16   lawyer went to recover responsive documents -- all of those

17   steps, logistical, mechanical matters -- and I am actually

18   quoting Judge Easterbrook in the *Feldberg* case, using those

19   terms -- are not privileged.

20             Would you agree with that?

21             MR. TRUSTY:  I would agree that where he went

22   would not be privileged.  But communications --

23             THE COURT:  ████████████████████████████

24   ████████████████████████████

25             MR. TRUSTY:  ███████████████████████████

**\* SEALED \***

* SEALED *



1
2
3
4
5
6
7          THE COURT:
8
9
10
11
12
13
14
15          MR. TRUSTY:  I don't believe I have case law that
16     stands for that direct proposition.
17          THE COURT:  I think I have case law that says
18     exactly the opposite.
19          MR. TRUSTY:  Understood.  I will admit to the
20     Court, my focus, in terms of protecting ▮▮▮▮▮▮ and the
21     President from disclosures here, is much more about the
22     inability of the government to tie any communication to a
23     crime fraud moment, which is really the sequence that you
24     have to have -- that nexus that you have to have here.
25          I guess they're saying, maybe, there was just

* SEALED *

1    obstruction forever, and therefore --

2              THE COURT:  Well, what I am saying is:  Some of

3    this information may not require application of the

4    crime-fraud exception because some of this information might

5    not be privileged at all.  And by asserting overbroad

6    privilege claims, you know, from the government's

7    perspective is, like, well, we could argue bit by bit

8    whether it's privileged or not privileged, but why don't we

9    just go full hog and ask for the crime-fraud exception and

10   get everything -- not just the identities, but get the

11   communications too?

12             MR. TRUSTY:  I have a very --

13             THE COURT:  I am not clear from your briefing

14   where you think the line is where crime-fraud exception is

15   required to get the information versus where it's not

16   privileged at all.

17             MR. TRUSTY:  Right.

18             THE COURT:  And I think the government has a

19   different view of where that line is, and you are confirming

20   that you have a different view of where the line is.

21             My role is to say:  This is where the legal line

22   is, and certain things have to be disclosed without even

23   getting to crime-fraud exception.  I am telling you right

24   now:  ██████████████████████████████████████████████

25   ███████████████████████████████████████████████████████

* SEALED *

```
1    ████████████████████████████████████████████████

2    ████████████████████████████████████.

3              MR. TRUSTY:  Your Honor, we're happy to kind of

4    internally digest that, talk to the government, respond to

5    an order, however this plays out in terms of --

6              THE COURT:  Well, I think the government is going

7    to be giving me a supplemental briefing by tomorrow.

8              MR. TRUSTY:  I would be happy to supplemental.

9              THE COURT:  I am going to ask you to -- give you

10   the same opportunity.

11             MR. TRUSTY:  Sure.

12             THE COURT:  I have told you where my legal

13   analysis has fallen.  You can tell me where I am wrong.

14   That's the beauty of the adversarial process; you tell me

15   where I am wrong by 4 o'clock tomorrow.

16             MR. TRUSTY:  All right.  I don't know that you are

17   wrong on anything yet.  I don't know that I have heard a --

18             THE COURT:  Well, you have take taken a position.

19             MR. TRUSTY:  -- particular bottom line.

20             But let me just say this, Your Honor, in the

21   middle of the comments you have just made, you said well:

22   The government might have just decided, well, let's just go

23   for the whole thing.

24             I really have a hard time accepting that somehow

25   █████████████ assertion of privilege -- albeit conceivably
```

* SEALED *

* SEALED *

1    from the Court's perspective overbroad, in terms of certain

2    elements of these ███████████ -- that we have somehow

3    baited the government into taking this approach.

4         THE COURT:  I didn't mean that.

5         MR. TRUSTY:  Okay.  I just want to make

6    sure that's not -- that's a hard one to knock down if the

7    Court believes --

8         THE COURT:  No.  That would be a

9    mischaracterization of the government's position.  They

10   feel -- they feel that they have ample evidence to support

11   invocation of the crime-fraud exception here.

12        MR. TRUSTY:  Your Honor, let me just address where

13   I think there is, kind of, a qualitative difference in what

14   the Court has in front of it.  Again, it's operating from

15   some guesswork necessarily.  This ties in, frankly, to the

16   idea of the communications.

17        The prima facie case to pierce these

18   communications has to have an element of -- has to have a

19   nexus, a causation.  In fact, the case law even makes it in

20   terms of subsequent -- the attorney who -- again, this is

21   the situation where the attorney is the innocent vessel of

22   fraud.  But where the -- you have to be able to show at

23   least prima facie not just that there is some crime fraud

24   that applies in general but they're, in fact, relying on

25   information or conduct of that attorney the fraud was

* SEALED *

1    perpetuated.

2              For the life of us -- this is just one of the

3    necessary shortcomings of our brief.  We can't imagine how

4    they have even briefed that.  It does not really show in the

5    papers that are public, in terms of suggesting we have some

6    way of knowing that this communication led to fraud.  I do

7    think there is a qualitative difference in a lot of cases

8    from both briefs.

9              If you will bear with me for just a quick moment

10   on this.  In *In re Sealed* case 676 F.2d 793 D.C. Circuit,

11   1982 --

12             THE COURT:  Yes.  I go by years.  There are so

13   many *In re Sealed* cases.

14             MR. TRUSTY:  Yes.  They're all going to start off

15   either sealed or grand jury.

16             THE COURT:  Yes.

17             MR. TRUSTY:  In 1982, the Circuit basically had

18   something that -- and I have had a hard time articulating

19   this.  It's kind of qualitatively different than government

20   proffer.  It's an internal investigation by the company

21   where they generate reports; the reports go to the

22   government.  They look at affidavits from company executives

23   that are clearly at odds, at least one is pushing toward

24   fraud on behalf -- during this investigation.

25             And that kind of makes sense, right? -- because

1    you are establishing the crime.  But you are also showing:

2    Hey, this crime passed through the attorney.  It's not just

3    me saying:  I know Donald Trump is a horrible man, and he

4    has obstructed, and pulling together threads -- and maybe

5    very incomplete threads -- these are documents that had

6    nothing to do with the government's credibility.  So that's

7    what you have in 1982.

8            In 1985, you had this -- I think it was a

9    religious group -- I forget the name, Synanon, or

10   something -- where they had sworn affidavits that basically

11   said:  When we got Attorney X, we started getting rid of

12   papers.  They are admitting to obstruction.  Obviously, that

13   may be beyond a reasonable doubt high; I get that that's a

14   really high example.  But that's where the court and where

15   the Circuit has been approving of this kind of unusual

16   intervention, where there is some sort of smoking gun

17   between the criminal activity and the communications with

18   the lawyer where that second prong can be met; and I am just

19   not seeing it.

20           I mean, you have got other examples -- I think it

21   was from the Third Circuit case that we cited -- where the

22   lawyer said:  You have some pretty messed up tax returns.

23   If you wanted to fix them, you have to file a correction

24   that says A, B, and C.  It was all, kind of, reeking of tax

25   fraud dishonesty.  As it turns out, that case, I guess, was

1   overturned on the piercing because there was no evidence

2   that the correction was ever filed.  But the bottom-line was

3   kind of the same concept I am talking about, which is:

4   We're not just relying on very gung-ho, very zealous

5   prosecutors and agents.  There is a lot that can be said --

6          THE COURT:  You don't have to persuade me on the

7   standard.  I understand prima facie case means you have got

8   to have specific facts -- not just specific facts; you have

9   got to have facts that would, to a reasonable person's

10  perspective, establish each element of each crime that you

11  allege was violated before I can apply the crime-fraud

12  exception.  So I get the standard.

13         MR. TRUSTY:  I understand.  But I am applying it

14  specifically to kind of where we are here in saying I don't

15  think there is a submission to the Court that says:  We have

16  reason to believe -- based on X-Y-Z, we have reason to

17  believe that ██████████ told President Trump the

18  following, which led to the following obstructive act.  I

19  don't think they can with a straight face -- maybe they

20  allege it.  But I don't think they're going to have the

21  evidence for that; and that's really the kind of level of

22  satisfaction for a prima facie case we have to have.

23         What we have in this case -- I do think I have to

24  make a brief record on this.  We don't concede that there is

25  any underlying crime at all.  We don't concede that there is

**\* SEALED \***

1   knowing, willful, specific intent, any sort of scienter to

2   play with when it comes to President Trump.  We believe that

3   there is heavy focus on the May 31st, June 1st time period

4   because of videos willingly turned over by our client.  But

5   even the moving of boxes days before DOJ would be invited in

6   is not evidence of a crime.  It's certainly not proof of a

7   crime.  It might be suspicious; it might cause them to put

8   100 people in grand jury.  It might cause them to threaten

9   people publicly.  But it's not the type of stuff that should

10   satisfy this Court that we have even the crime-fraud

11   exception in general, much less the linkage to the

12   communications with counsel that I'm trying to help focus

13   the Court on.

14          I think that the search warrant in a lot of

15   ways -- I heard how it was argued, hey, this is way more

16   than prima facie; this is probable cause.  Again, we are not

17   privy to all of the details of the search warrant, but it

18   remains an unchallenged warrant right now.  We would love to

19   have full disclosure, possibly a *Franks* hearing if there is

20   evidence to support that.  We think it's criminalized the

21   Presidential Records Act in a way that has never been done

22   in history and doesn't seem to be happening north of this

23   area.

24          So it's a very odd scenario to submit all these

25   allegations of federal obstruction when we're not even

**\* SEALED \***

**\* SEALED \***

1    satisfied, from our eight -- six months of investigation

2    that there is an underlying crime or that even documents are

3    necessarily classified that they referred to.  So there are

4    so many open challenges that we would love to be able to

5    make -- even if it's not a mini-trial, but to have some

6    ability to have some transparency in a case this important

7    that we are kind of at a loss for how we can argue against

8    the unknown.

9              THE COURT:  I feel your pain.

10             MR. TRUSTY:  Thank you.

11             Your Honor, if I can just check my notes for a

12    quick moment.

13             The Court had questions about ████████.  The

14    Court is half judge, half investigator; you said:  That's

15    the ██████████████████████████████.

16             THE COURT:  Well, when I put the timeline

17    together, I felt from ████████ -- they're doing a

18    search. ██████████████████████████████████████████.

19    I mean, ██████ really juggling a bunch of balls those few

20    days.

21             MR. TRUSTY:  Yes. ██████████████.

22             I would love to borrow the Court's timeline at

23    some point, but I am assuming you won't share it.

24             ██████████, I mean, the Court -- really what that

25    touches on, it was a factual kind of inquiry.  Couldn't this

**\* SEALED \***

**\* SEALED \***

1  be a communication that relates entirely to compliance with

2  a subpoena and, therefore, falls out of any fraud exception.

3  I think that's a perfectly great point.  And it goes to the

4  notion that even asking a question shows they haven't

5  established that it's in furtherance of anything.  They've

6  picked a date that they seemed to like, and they should have

7  to live and die by that date.  ███████████████████████

8  ████████████████████████████████████████████████████

9  ███████ .

10          Your Honor, I do want to leave time for

11  ██████████████  counsel.  I am happy to answer any questions

12  the Court has now or after hearing from ███████████ .

13          THE COURT:  Well, one of the things that you say

14  in your opposition is that the government effectively ended

15  the compliance conversation on ██████████████████████

16  ███████████████████████████████████████████████████ ,

17  and I just really didn't understand that.

18          What are you talking about there?

19          MR. TRUSTY:  Sure.  That's a great question

20  because there is a greater context that will get me to that.

21          In a normal situation where you are counsel for an

22  organization and there is a subpoena that is received from

23  the government, there is a give and take.  Sometimes you

24  look at the subpoena, you go:  You are going to shut down my

25  business for ten years if I do all of these things.  There

**\* SEALED \***

**\* SEALED \***

1    is always communications -- almost always communications

2    between the parties; that's what I was kind of talking about

3    with the elephant and the blind men misplaced parable, which

4    is ████████████ --

5          THE COURT:  And I don't get it, to be honest with

6    you.  I am pretty -- it's too subtle for me.

7          MR. TRUSTY:  Thank you for that generous out.  I

8    will take the out.

9          Here is the point, Your Honor.  ████████

10   ████████████████████████████████████████

11   ████████████  ████████████  ████████████

12   ████████████████████████  ████████

13   ████████  ████████████████  ████████

14   ████████████  ████████████████

15   ████████████████████████████████

16   ████████████████████  ████████

17   ████████████  ████████████████

18   ████████████████████████████████

19   ████████

20        ████████████████████████████

21   ████████████████████████████████

22   ████████████████  ████████████

23   ████████  ████████████████████  ██

24   ████████████

25        ████████████████████████████

**\* SEALED \***

**\* SEALED \***



I mean, they keep investigating to be sure.

███████████████; they're looking for videos and all of

that.

But the next contact -- the next substantive

contact with counsel that was in the process -- I would

emphasize the word "process" -- of compliance is the raid on

August 8.  That's why we point to this kind of self-selected

breakdown by the government when they could have taken up

the President at his word.  Come on over, we'll let you see

stuff, or some form of communication or even court

intervention.  But, instead, they went with the search

**\* SEALED \***

* SEALED *

1   warrant.

2           We have never been able to see the whole warrant,

3   the affidavit.  The Attorney General chose to publicize the

4   warrant and the inventory which was convenient.  But we

5   would love as a remedy, if the government insists on going

6   forward with this ax instead of a scalpel -- to use another

7   analogy -- that we have an opportunity for fair play to

8   actually look at these things and be able to weigh it.  And

9   maybe we'd look at them and say, man, they kind of got it

10  right; we underestimated.  As officers of the Court, we'd

11  fold and say we don't have anything new.

12          But from everything I have seen including today,

13  we would have legitimate serious concerns about how the

14  facts are being slanted or completely understated.

15          THE COURT:  Thank you, Mr. Trusty.

16          MR. TRUSTY:  Thank you, Judge.

17          THE COURT:  Mr. Levy.

18          MR. LEVY:  Good afternoon, Your Honor.

19          I think it's very important, when the government

20  is seeking to invade the independent private work product of

21  an innocent attorney, I think what Judge Skelly Wright, in

22  1982, called "the blameless attorney" --

23          THE COURT:  Okay.  Let's just cut through this

24  because I think the government has agreed to assume and take

25  off the table any production of opinion work product.

* SEALED *

1        MR. LEVY:  Yes.

2        THE COURT:  So that's off the table.

3        MR. LEVY:  Great.

4        THE COURT:  And I think that one sort of

5   misunderstanding, I guess, between the parties -- between

6   whether it's a privilege log from the original privilege log

7   list versus ███████████ view or your view of what relates

8   to the ███████████ alone -- I think we have gotten that

9   clarified.

10       The government is interested in everything on the

11  original privilege log list with redactions of any opinion

12  work product.  So that's one legal issue taken off the table

13  which I appreciate.  And you-all have done the job of

14  figuring out what is severable, what isn't, at least for

15  your shorter privilege log list.

16       I want to hear from you specifically about why you

17  think contrary to the government, which views the ███████████

18  as coterminous with the subpoena request for documents --

19  why you think it's not coterminous?

20       Because, frankly, I have looked -- I didn't have

21  the subpoena until the government gave it to me to see what

22  everybody was talking about, without understanding I didn't

23  have the subpoena to look at what the document request was.

24  So when I looked at that, it did appear to me that the

25  document requests were pretty coterminous with the ███

**\* SEALED \***

1    ███████.

2         So I am a little bit puzzled about the difference

3    in why you see that there are differences and why the

4    government isn't right that what is at issue here is not --

5    I am going to call it the shorter list versus the original

6    list -- why it is that you think only the shorter list is

7    relevant.

8         MR. LEVY:  Sure.  I am happy to do that.

9         I would like to also briefly address the request

10   for testimony and the request --

11        THE COURT:  Okay.  I was drilling down on the

12   documents first.

13        MR. LEVY:  Not a problem.

14        So one example we gave in our response to the

15   ████████████ was --

16        THE COURT:  ███████████████.

17        MR. LEVY:  -- ████████████████ is one.

18        The other one is, we took the position that it was

19   responsive to the subpoena, which asked for documents

20   related to ███ search of the storage room to provide, for

21   example, ████████████████.  ████████████████ don't

22   have anything to do with the ███████ that they have

23   identified.  Similarly, we provided █████████████████

24   ████████████████ that relates to the search but does not

25   relate to the ██████████.

**\* SEALED \***

**\* SEALED \***

1    Your Honor, you have identified communications

2   during this time period that may relate to the search but

3   don't relate to these six topics.

4    So, for example, on our privilege log -- and we

5   can provide more information about this perhaps in an *ex*

6   *parte* and speak to ███████████ -- there are a number of

7   materials after ███████████ engaged in ███ search that

8   relate to ███ search but do not relate to these ███████████.

9   And --

10    THE COURT:  ███████████████████?

11    MR. LEVY:  Yes.  In fact, the majority of the

12   items that were on the original privilege log but were not

13   on the revised privilege log are after ███████  So we took,

14   I think, appropriately a broad interpretation of the search.

15    THE COURT:  So is that -- just dealing with dates,

16   so most -- so some of the difference between the shorter

17   privilege log versus the original, longer privilege log has

18   just to do with date cut off, is there anything post-███████

19   ███, you did not put on your shorter privilege log?

20    MR. LEVY:  No.  We didn't cut that -- we cut it

21   based on the actual ███████████ they asked, to see if they

22   addressed those ███████████.

23    There are matters that are after ███████ that we

24   concluded were responsive to those ███████████, and we

25   included those on the revised log.  What dropped off were

**\* SEALED \***

1   topics that were not part of -- were items that didn't

2   relate to the ███████. In fact, that is very instructive

3   here of something that I think is really important. We

4   should not be painting with a broad brush when we're talking

5   about these things. We should be very tangible and very

6   specific.

7           THE COURT: What's the total number of -- just

8   remind me. What's the total number of documents on the

9   shorter list, do you know?

10          MR. LEVY: I believe it's ██.

11          THE COURT: ██, okay. That sounds about right.

12          On the original longer list, how many documents

13  are there? About double that?

14          MR. LEVY: Apparently just -- I am told just over

15  ██. I haven't reviewed either of them and counted.

16          But I think a lot of this is sort of getting ahead

17  of ourselves because if -- the only place in which my

18  argument arises at all is if the Court has already concluded

19  that the crime-fraud exception vitiates President Trump's

20  attorney-client privilege and President Trump's interest in

21  the work product or there is another basis for concluding

22  that responsive information about some or all of those ████

23  ██████ is not protected by that privilege. So all of this

24  is if that happens.

25          If that happens, ██████████, as an officer of

**─ * SEALED * ─**

1    the Court, would testify with respect to the topics that the

2    court orders and provide the facts and the communications

3    related to those six or fewer topics as ordered by the

4    Court.

5          THE COURT:  I didn't doubt that.

6          MR. LEVY:  And once that has happened, it's

7    unclear to me why the government would need to go further,

8    beyond that, to invade ███ work product.  In other words --

9          THE COURT:  So in addition to the government's

10   concession that they're not after opinion work product, you

11   also want to put off the table any fact work product.

12         Am I understanding you correctly?

13         MR. LEVY:  Yes.  Because at this point I think

14   there is a difference -- I will concede, the case law trying

15   to distinguish between the underlying facts -- what is fact

16   work product and what is opinion work product -- can be

17   confusing.  Courts seem to deal with it differently, at

18   least the way I have looked at it.

19         ████████  testify about the underlying facts.  To

20   go beyond that, for example, to ask ███ to testify:  ███

21   ████████████████████████████████████████████████

22   ██████████████████████████████████

23   ████████████████████.  That, many courts would say, is fact

24   work product.  I think that's completely unnecessary to get

25   into.  And once ██████ testified to the underlying facts --

*** SEALED ***

──────── * SEALED * ────────

1       THE COURT:  That is the puzzle of the difference

2   between fact and opinion work product, isn't it?

3       MR. LEVY:  Right.

4       THE COURT:  ███████████████████████████

5   ████████████████████, is that fact or is it opinion?

6   It's his opinion or her opinion about what is relevant or

7   particularly noteworthy.

8       MR. LEVY:  I feel your pain.  Yes.

9       But I think what I am saying is that with respect

10  to ██ work product, once the government has gotten ██

11  testimony about what the facts are, perhaps then they can

12  either demonstrate a substantial need to go beyond what the

13  facts that ██████ testified to to get ██████ fact work

14  product or -- and this is important, Your Honor:  The

15  D.C. Circuit has never held that the crime-fraud exception

16  of the client vitiates the lawyer's work product, period,

17  whether fact or opinion.

18      And even those courts that have held that it

19  vitiates fact work product require the government to

20  identify how the specific piece of work product was used by

21  the client to further the crime or fraud.  There has been no

22  showing like that right now.

23      Essentially, they're just saying:  Before we hear

24  what the facts are, we want the Court to order █████████

25  to, basically, produce ████ files to the Court; force you to

**\* SEALED \***

* SEALED *

1   review all █████ files; make some judgments, and then go

2   forward -- when ███████████ will provide the facts and the

3   communications, the things that they say they actually want.

4           THE COURT:  So what you are proposing is a

5   staggered approach should -- and I am going to get to this,

6   exactly what is not privileged at all and the line of --

7   that I went over with Mr. Trusty and what actually requires

8   an application of the crime-fraud exception.

9           But once I get past that, you are saying I should

10  decide that in terms of █████testimony and, then, in a

11  staggered approach then resolve what work product, if any,

12  whether it's opinion or fact, should be produced.

13          Is that what you are proposing?

14          MR. LEVY:  Yes.  Because they have not --

15  essentially, they have conceded by asking for everything;

16  that they don't have a substantial link between the use of a

17  particular piece of ████████████ work product that ████

18  client sought to use a particular piece of work product in

19  furtherance of that crime or fraud.

20          So I believe that, once ███████████ has provided

21  the underlying facts in █████testimony, the facts will be

22  there.  There won't actually be a need to invade the work

23  product of an innocent attorney.  And, frankly, if the

24  government believes at that point that they have a

25  substantial need for particular work product -- in the first

* SEALED *

* SEALED *

1   instance, they should come to me and explain why they

2   believe they have a substantial need.  We have had a

3   productive and professional working relationship with the

4   Office of Special Counsel from the time we got involved

5   here.  We can assess that.

6            It would focus -- to the extent that there is a

7   dispute over that, it would be a much more focused dispute

8   and the government would presumably, at that point, be able

9   to identify a substantial need to go beyond the facts to get

10  ███████ work product.  Because otherwise they're just asking

11  to see everything, and there is not a basis for them to ask

12  to see everything at this point.

13           So essentially --

14           THE COURT:  Would one benefit from your staggered

15  approach be that, under *Zolin*, I don't have to make a *Zolin*

16  finding and review a whole bunch of documents --

17           MR. LEVY:  Yes.

18           THE COURT:  -- as part of the crime-fraud analysis.

19           MR. LEVY:  Yes.  If Your Honor concludes based on

20  the information that's available to you that the prima facie

21  case for crime-fraud exception has been made or that there

22  is another basis for concluding that some of this

23  information is not privileged -- not protected by the

24  privilege -- then there is not a need to go through all of

25  these materials to draw that conclusion.

* SEALED *

**\* SEALED \***

1     ████████████ then would testify about the facts on

2     however many of these ████████ you want ██████.  It avoids

3     the risk of getting into other matters ██████ engaged in on

4     behalf of ███client, it avoids invading that topic --

5     right? -- because, again, as I said -- the government said

6     that they're largely coterminous.  They are not coterminous

7     in some pretty significant ways that we can cite.  It avoids

8     that question entirely.  It focuses the testimony, as it

9     should be, on those topics; provides the facts on those

10    topics --

11           THE COURT:  And how do you say that they are not

12    coterminous?

13           I am going to ask the government the same thing.

14    But I may have glossed over the fact that they said only

15    largely coterminous.  I thought they looked, from my quick

16    read, as pretty coterminous.

17           But how are they not?  On what topics?

18           MR. LEVY:  So I am not sure that I am comfortable

19    explaining the topic other than in an *ex parte* proceeding

20    because I do not want to run afoul of ████████████ ethical

21    obligation to maintain the privileges of ███client barring

22    a ruling overcoming them.

23           THE COURT:  Believe me, I would rather get ██████

24    ████████████.  So I am going to want to hear that *ex parte*.

25    Does it have to be -- it can be *ex parte* with the

**\* SEALED \***

**\* SEALED \***

1    government.  But Mr. Trump's counsel can be here for that?

2              MR. LEVY:  Mr. Trump's counsel can be here for

3    that, that's not an issue.  I believe, again, Your Honor has

4    already alluded to --

5              THE COURT:  The government doesn't know what it

6    doesn't know either.

7              MR. LEVY:  Exactly.

8              Part of this is ████████████ is a lawyer

9    representing a client in an investigation.  ████ work

10   product -- unless there is some reason to believe ████ work

11   product was used in furtherance of a crime or fraud, ████

12   work product should remain confidential.

13             Certainly, the government should not be asking ████

14   to hand over to the Court or to them materials that go to

15   other aspects of ████ representation of ████ client that go

16   beyond the items they have specifically identified.  So I am

17   happy to walk the Court through that, I don't think it's

18   terribly complicated.

19             Again, we were very --

20             THE COURT:  Let me just ask the government.  I am

21   going to interrupt you for a second and see if -- do we have

22   to -- maybe we don't have to talk about this topic much

23   more.

24             From the government's perspective, this is a very

25   troubling point, to have attorney work product in the middle

**\* SEALED \***

1    of an investigation turned over to the government even if I

2    should find the crime-fraud exception applies when -- beyond

3    just getting the testimony from the lawyer.

4            So there are certain documents on the privilege

5    log that are just being withheld under attorney-client

6    privilege.  Is there really a need for the government to

7    pursue any attorney work product withheld documents?

8            MR. PELLETTIERI:  Well, the crime-fraud exception

9    applies to both attorney-client material and work product

10   material.

11           THE COURT:  What's wrong with the staggered

12   approach Mr. Levy's proposing?

13           MR. PELLETTIERI:  I think it's unprecedented, puts

14   the cart before the horse.  And it would be totally the

15   opposite of what *Zolin* prescribes and permits.

16           The whole point of *Zolin* is that, yes, the

17   government doesn't know what is in there, so it has a lesser

18   showing.  It just has to show a reasonable basis to conclude

19   that there may be crime fraud material in these documents.

20   We have gone far beyond that.

21           And then, once that very low threshold is crossed,

22   the documents go to the Court.  This is a tried and true

23   procedure.  The Court then, at that point, determines, well,

24   yes, is there the nexus between the crime fraud there?  And

25   then another layer here, only because ███████████ is

* SEALED *

1   independently asserting the work-product privilege -- in

2   most of the cases -- all of the cases in the D.C. Circuit

3   dealing with the crime-fraud exception and work product,

4   this is not an issue.  They just automatically vitiate any

5   kind of work-product privilege, both opinion or fact -- in

6   fact, the 1982 cases specifically regarding opinion work

7   product.

8           The only additional layer here --

9           THE COURT:  All right.  I get it.  You are not

10  going to go for the staggered approach.  Thank you.

11          MR. LEVY:  Your Honor, if I may be heard.

12          It's really important to keep in mind *Zolin* was a

13  case involving the client's assertion of the client's

14  attorney work product and the client's attorney client

15  privilege.  It was not an assertion by the innocent,

16  independent interest with respect to work product.

17          If the Court needs to review things for purposes

18  of *Zolin* to decide whether the client's privilege claim is

19  valid or not, that's what *Zolin* applies to.

20          When it comes to the independent interest and the

21  work product of an innocent lawyer, the government first

22  needs to make the showing it would need to make to get a

23  *Zolin* review of that, which is, they would have to show that

24  there is some basis to believe that the materials were used

25  in furtherance of the crime or fraud.  And there is no

* SEALED *

1    indication here that any of the work product was used in

2    furtherance; the notes are a great example.

3    ███████████████████████████████████████████.

4    There is no indication ██████ showed anybody else the

5    █████████████ intended to show anybody the █████.  They

6    were purely for ████ purposes.  There is no evidence that ████

7    client even knew ████████ existed.  So how can that be

8    shown to have furthered -- that the client intended to

9    further a crime or fraud through the use of ██████ that he

10   had no idea even existed.  It just can't be.

11          So the idea here is not putting the cart before

12   the horse but, rather, dealing with the overcoming of the

13   client's privilege first; that's what makes sense.  The

14   client's privilege, to the extent it's vitiated by the

15   crime-fraud exception, should be addressed first in that he

16   can provide facts on.  Only once that's been addressed

17   should the government have to go and establish why it needs

18   to go beyond that to invade the attorney's -- an innocent

19   attorney's independent interest in their work product.  They

20   don't need to.

21          They will get what they want by getting what

22   they're going to get from ████████████████ testimony,

23   which are the facts and the communications.  That is the way

24   to ensure that if ████ client's privilege is overcome it does

25   not also invade the privilege of an innocent lawyer

* SEALED *

1    unnecessarily.  And this would be unnecessary.

2              THE COURT:  All right.  Are you done?

3              MR. LEVY:  Unless Your Honor has more for me.

4              THE COURT:  No.  Thank you.

5              MR. LEVY:  Thank you.

6              THE COURT:  All right.  Does the government want

7    to respond?

8              MR. PELLETTIERI:  I just want to make one quick

9    additional point about Mr. Levy's presentation.

10             The idea that a document could not be subject to

11   the crime-fraud exception because it was never given to the

12   client is not consistent with the scope of the crime-fraud

13   exception as it applies to work product.

14             What is at issue is whether the consultation

15   furthered or facilitated a -- or the material further or

16   facilitated a fraud.  Sometimes you have a consultation that

17   results in work product material that reflects -- that

18   material reflects the consultation itself that furthered the

19   fraud.

20             The client himself doesn't need to actually obtain

21   that document, whatever it is, and then independently use

22   that document in furtherance of the crime or fraud.  It's,

23   really:  Does that document reflect the consultation that

24   furthered or facilitated the crime or fraud?

25             THE COURT:  Okay.  Could you just address this --

* SEALED *

1    what I understood to be the government's position that the

2    ████████ are, basically, coterminous with the document

3    request?  And Mr. Levy's pointed out that you said "largely

4    coterminous."  Where are they not coterminous?

5        MR. PELLETTIERI:  We believe they're coterminous.

6    We understand that Mr. Levy said:  Well, I produced ████

7    ████.  But when you add the other layer with what we're

8    asking is, it's only responsive documents in those

9    categories that actually are also communications and

10   consultations with ████████ and the client.  Clearly,

11   anything that is a communication or consultation with

12   ████████ and that also falls within that subpoena is

13   necessarily coterminous with the six topics.  We don't see

14   any daylight between them.

15       Even if you assume there was a little bit of

16   daylight, we think we're still, under *Zolin,* entitled to the

17   *ex parte* review.  We have made that threshold showing that

18   the documents in that privilege log may contain crime fraud

19   material under the *Zolin* standard and, at that point, *in*

20   *camera* review is appropriate.  And then the Court further

21   reviews those documents to determine whether they were each

22   in furtherance or facilitated the crime or fraud, and then

23   excises -- because we have accepted that opinion work

24   product is not covered here, excise ████ opinion work

25   product.  That's consistent with the general practice for

*** SEALED ***

1    opinion work product totally outside the crime-fraud

2    exception in the FTC cases.

3            Courts regularly look to documents and then excise

4    the opinion work product.  So this is just consistent with

5    really kind of established practice, what we're asking for

6    here.

7            THE COURT:  All right.  I want to do -- I want to

8    hear more detail from Mr. Levy about whether he thinks --

9    now that we have complete clarity that the "largely" doesn't

10   mean "largely."  The government does think it's pretty

11   coterminous.  I want to hear from Mr. Levy on an *ex parte*

12   basis.  I will excuse the government to go to my jury room.

13           (Whereupon, government counsel exit the

14   courtroom.)

15           THE COURT:  Mr. Levy.

16           So the record is clear, government counsel has now

17   left the courtroom during this *ex parte* portion of the

18   hearing.  I have former President Trump's counsel and

19   ██████████████  counsel.

20           MR. LEVY:  Thank you, Your Honor, for letting me

21   be heard on this in an *ex parte* way.

22   ███████████████████████████ █

23   ████████████████████████████

24   █████████████████████████████

25   ████████████████████████████

*** SEALED ***

* SEALED *



* SEALED *

**\* SEALED \***



**\* SEALED \***

* SEALED *



THE COURT:  Okay.  Can you get the government?

(Whereupon, government counsel returns to the courtroom.)

THE COURT:  All right.  I think I have exhausted all of us with argument, and I have another hearing coming up.  So let me just say that I am expecting from the government a supplemental filing by 4 o'clock tomorrow as we discussed.

Mr. Trusty, I am expecting, by 4 o'clock tomorrow, a supplemental submission by former President Trump -- on his behalf.

With respect to ███████ and Mr. Levy, let me just say that under *Zolin* there is not a stringent standard; I think the Supreme Court has said that.  It's, basically, a

* SEALED *

1    lesser evidentiary showing required, ultimately, to overcome

2    the attorney-client privilege, under *Zolin,* in order to have

3    *in camera* review of the withheld documents under privilege

4    or work-product doctrine.

5         I do find that based on what I understand from the

6    government's *ex parte* submission -- appreciating the debate

7    about whether the document production called for under the

8    subpoena is coterminous or not with the six topics -- having

9    heard the government's *ex parte* explanations regarding the

10   ███████ subpoena, I will ask to have *in camera* submission

11   of the ███████ documents, however many -- hopefully, not

12   too many over ████████████, that have been withheld on the

13   longer -- I think it's the January 11, 2023, privilege

14   log -- appreciating Mr. Levy's point that the distinction

15   between fact and opinion work product is difficult to

16   ascertain.

17        I would ask that you put in red text box all of

18   the material that you think is opinion work product just so

19   I can see what you are calling opinion work product, which I

20   will try and respect as much as possible, so that I can see

21   what gloss you are putting on the difference between the

22   two.  In the end, should I find that the crime-fraud

23   exception is properly applied here, I would then ask you to

24   produce the attorney-client privilege and the fact work

25   product in those withheld documents; and you would then turn

1    your red text box into blackout boxes.  I think that's how I

2    am going to proceed here.

3            I would like you to be able to do that also by

4    4 o'clock tomorrow.  Since you have already done the

5    severance -- severability, hopefully, that won't be too much

6    of a problem.

7            MR. LEVY:  If I could approach the bench on one

8    matter.

9            THE COURT:  Yes.  Do you want to do this --

10           MR. LEVY:  Side bar.

11           (Whereupon, a bench conference was held.)

12           MR. LEVY:  Some of █████████████ we have

13   made a transcription of.  It would be far easier for us to

14   be able to red box the transcript rather than the underlying

15   materials.

16           THE COURT:  Please.  Yes.

17           MR. LEVY:  It would be easier for you to review

18   them that way, but it's not technically the actual document.

19   It's not formally transcribed.  It's ███████████ effort

20   to be as accurate ████████.

21           THE COURT:  Okay.  This is what you are going to

22   do.  You are just going to give me the transcript.  Thank

23   you.  I appreciate that.

24           MR. LEVY:  You're welcome.

25           THE COURT:  Should the government ever want to

**\* SEALED \***

```
1    have the original, they'll have to ask for it.

2              MR. LEVY:  Okay.  Thank you.  I appreciate it.

3              THE COURT:  Thank you.

4              (Whereupon, the bench conference concludes.)

5              THE COURT:  Thank you.

6              All right.  With that, I don't think there is

7    any -- yes.

8              MR. PELLETTIERI:  Briefly, Your Honor.

9              Just so we don't have to separately file a motion,

10   can we have -- we'd like to have permission to order the

11   transcript.

12             THE COURT:  Yes.  All parties that want the

13   transcript, and that is granted.

14             MR. PELLETTIERI:  Thank you, Your Honor.

15             MR. TRUSTY:  One other very quick question, Your

16   Honor.

17             THE COURT:  Yes, Mr. Trusty.

18             MR. TRUSTY:  Just in terms of the supplemental

19   briefing on our side.  I want to make sure I don't fail on

20   the expectation.

21             I know we talked about the Parlatore transcript as

22   being something to supplement.

23             THE COURT:  Right.  I haven't seen it, I don't

24   think.

25             MR. TRUSTY:  That's what I am saying.  We'll,
```

**\* SEALED \***

*** SEALED ***

1    basically, make that an exhibit for the supplement.

2              Is there any other specific thing you wanted us to

3    brief in the supplement?  I didn't really catch a direct

4    instruction.  I am happy to --

5              THE COURT:  Well, if you see anything in the

6    transcript that you -- I can't think of anything offhand.  I

7    thought there was a legal matter.  My law clerk probably

8    made a note of it.

9              Hold on a second.

10             (Whereupon, the Court and staff confer.)

11             THE COURT:  Yes.  Any case law that you have that

12   says the identities of the people who were talked to in

13   executing a search is privileged.

14             MR. TRUSTY:  Got you.

15             THE COURT:  All right.  I knew there was a

16   supplemental legal issue that there was a dispute about.  I

17   wanted to make sure -- to the extent this is adversarial, I

18   want to make sure that I get everybody's position straight.

19             MR. TRUSTY:  Sure.  Much appreciated.  Thank you.

20             THE COURT:  Yes.

21             MR. PELLETTIERI:  Nothing, Your Honor.  We were

22   just going to remind you about the issue --

23             THE COURT:  Yes.  My law clerk -- my trusty law

24   clerk was on top of that.  With that, you are all excused.

25   Thank you.

              (Whereupon, the proceeding concludes, 12:45 p.m.)

*** SEALED ***

**\* SEALED \***

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 12th day of March, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

**\* SEALED \***